# NEW ORLEANS PACIFIC RAILWAY COMPANY *v.* PARKER.

APPEAL FROM THE CIRCUIT COURT OF THE UNITED STATES FOR THE WESTERN DISTRICT OF LOUISIANA.

No. 137.  Argued January 4, 5, 1892. — Decided February 1, 1892.

When several plaintiffs claim under the same title, and the determination of the cause necessarily involves the validity of that title, and the whole amount involved exceeds $5000, this court has jurisdiction as to all such plaintiffs, though the individual claims of none of them exceed $5000: but where the matters in dispute are separate and distinct, and are joined in one suit for convenience or economy, the rule is the reverse as to claims not exceeding $5000.

A mortgage by a railroad company of its railroad, rights of way, road-bed and all its real estate then owned or which might be thereafter acquired appurtenant to or necessary for the operation of the railroad, and all other property wherever situated in the State, then owned or which might thereafter be acquired by the company, and which should be appurtenant to or necessary or used for the operation of its road, and also the tenements, hereditaments and appurtenances thereunto belonging, does not cover a grant of lands within the State subsequently made by Congress to the company in aid of the construction of its road.

An appurtenance is that which belongs to or is connected with something else to which it is subordinate or less worthy, and with which it passes as an incident; and in strict legal sense land can never be appurtenant to land.

A grant to a railroad company of public lands, within defined limits, not sold, reserved or otherwise disposed of when the route of the road becomes definitely fixed, conveys no title to any particular land until the location, and until the specific parcels have been selected by the grantee and approved by the Secretary of the Interior.

If a holder of one or more of a series of bonds issued by a railroad company and secured by a mortgage in terms like this mortgage has a right to institute proceedings for the foreclosure of the mortgage, (about which no opinion is expressed,) he is bound to act for all standing in a similar position, and not only to permit other bondholders to intervene, but to see that their rights are protected in the final decree.

THE court stated the case as follows:

This was a bill in equity to foreclose a mortgage, and a cross-bill to have the mortgage decreed not to be a lien upon

the land grant involved in the controversy. The bill was originally filed February 15, 1886, by the plaintiff Parker, "for himself and for all parties holding bonds and coupons similar to those herein set forth," against the New Orleans, Baton Rouge and Vicksburg Railroad Company, (hereinafter called the Baton Rouge Company,) the Union Trust Company of New York, the New Orleans Pacific Railway Company, (hereinafter called the Pacific Company,) John F. Dillon and Henry M. Alexander, trustees in certain land-grant mortgages of the Pacific Company, and Samuel D. McEnery, then governor of Louisiana, to foreclose a mortgage given by the Baton Rouge Company, October 1, 1870, upon the property of the company and upon a land grant claimed to be covered by such mortgage. Plaintiff Parker claimed only the amount of coupons matured upon two bonds. Subsequently one Hamlin, another bondholder under the same mortgage, intervened in the cause, which was tried in the Circuit Court, and two distinct decrees rendered upon the same day; one in favor of Parker in the sum of $2400, with interest at five per cent from October 1, 1885, and one in favor of Hamlin for $6000 with like interest. 33 Fed. Rep. 693. The mortgage in question, so far as it is material to be considered, purported to cover the right of way, . . . "also all other property, real and personal, of every kind and description whatsoever and wherever situated in the State of Louisiana, which is now owned or which shall hereafter be acquired by the said company, and which shall be appurtenant to or necessary or used for the operation of said main line of railroad or any of said branches," etc. The mortgage, which was made to the Union Trust Company of New York, provided that the holders of bonds and coupons should have the right to institute legal proceedings for its foreclosure. The company put the bonds, secured by this mortgage, upon the market, and disposed of a number of them. This mortgage was by public act and was recorded in several of the parishes through which the main line and the branches were to run.

By an act of Congress approved March 3, 1871, 16 Stat. 573, c. 122, to incorporate the Texas Pacific Railroad Company, certain lands in Louisiana were granted to the Baton Rouge

Company in aid of its construction of a railroad from New Orleans to Baton Rouge, thence by way of Alexandria to the eastern terminus of the Texas Pacific Railroad at Shreveport.

On November 11, 1871, the Baton Rouge Company filed in the General Land Office a map designating the general route of its road from Baton Rouge, by way of Alexandria, to Shreveport, and thereupon the withdrawal of the public lands along this line was ordered, in accordance with the provisions of the above act of Congress, secs. 12 and 22. In 1881 the Baton Rouge Company transferred all its right, title and interest in these lands to the Pacific Company, and in March, 1885, patents were issued to said company, as assignee of the Baton Rouge Company, for 679,287 acres of land lying in different parts of the State.

At the time this assignment was made no work either upon the main line or upon the branches had been done by the Baton Rouge Company. December 28, 1870, the Baton Rouge Company executed a second mortgage to the governor of the State, as trustee, to secure the payment of certain bonds which were never issued. Such second mortgage having been subsequently cancelled, on September 4, 1872, one Allen, assuming to act as president of the Baton Rouge Company, also executed a mortgage to secure the payment of 12,000 bonds, which, however, appear never to have been issued.

By acts of mortgage dated April 17, 1883, and January 5, 1884, the Pacific Company executed to appellants Dillon and Alexander a land grant and sinking fund mortgage upon the lands acquired from the Baton Rouge Company, to secure the payment of certain bonds, which the bill averred to be subsequent and subordinate to the mortgage executed by the Baton Rouge Company to secure the payment of the bonds in suit.

None of the defendants named in the bill appeared except the Pacific Company and Dillon and Alexander, trustees of the land grant mortgage of this company. These parties filed a general demurrer, which was argued and overruled, in September, 1886, and a decree *pro confesso* was entered against the other defendants. Subsequently an answer was filed, alleging in substance that the charter of the Baton Rouge Company

did not authorize a mortgage on the land grant or on future property; that the mortgage did not embrace the land grant; that the Baton Rouge Company made no definite location of its road, nor built any portion of the same; that the Pacific Company purchased from the Baton Rouge Company, as alleged in the bill, and thereupon constructed its road; and that the legal title to the land grant remained in the United States until patents were issued to this company. October 13, 1886, these defendants filed a cross-bill setting forth that the cross-complainants were endeavoring to sell the lands that had been patented to them, and were being embarrassed and prevented by reason of the claim set up by Parker in his bill; that as the mortgage sought to be foreclosed, and the outstanding bonds secured thereby did not mature for several years, they would continue to be embarrassed for a long time; that Parker had sued on behalf of himself and of other holders of bonds issued under the mortgage of 1870, and, as complainants were advised and believed, represented upwards of two hundred of said bonds, each holder of which might bring suit and involve them in a multiplicity of suits; and that only a court of equity could afford relief by removing this mortgage as a cloud upon the title of the Pacific Company to the lands; and prayed for a decree adjudging that the mortgage did not embrace the land grant in question. Parker subsequently filed a demurrer to this cross-bill. On December 24, 1886, Hamlin intervened by petition, and was admitted as a co-plaintiff in the cause. Subsequently the case was heard and separate decrees rendered in favor of Parker and Hamlin for the amounts of their several claims, adjudging the mortgage to be a valid lien upon the lands, which were ordered to be sold, and dismissing the cross-bill. Appellants took an appeal from these decrees to this court. Parker thereupon moved for a dismissal of the appeal as to him upon the ground that less than $5000 was involved. The consideration of this motion was postponed to the merits.

*Mr. William Wirt Howe* and *Mr. John F. Dillon* for appellants. *Mr. Wager Swayne* was with them on the brief.

Mr. A. H. Garland for appellees (Mr. A. H. Leonard was on the brief as of counsel for appellee Parker).

I. The equitable jurisdiction of the Federal courts attaches in Louisiana just as it does in other States, and causes in equity instituted in Louisiana in such courts must be determined by the rules and principles of equity.

It is the general rule of the common law that future property cannot be mortgaged, but the rule of the civil law is different. "Those who bind themselves by any engagement whatever may, for the security of their performance of the engagement on their part, appropriate and mortgage not only the estate they are masters of at the time of contracting, but likewise all the estate which they shall be afterwards seized or possessed of." 1 Domat, Cushing's ed. 649, Art. 5. With reference to the sale or mortgage of future property, equity has adopted the principles of the civil law. *Mitchell* v. *Winslow*, 2 Story, 630; *Willink* v. *Morris Canal Co.*, 3 Green Ch. (3 N. J. Eq.) 377; *Pierce* v. *Emery*, 32 N. H. 484. In *Pennock* v. *Coe*, 23 How. 117, this court held that a railroad company, authorized to borrow money and issue their bonds to enable themselves to finish and stock the road, may mortgage not only the then acquired property, but such as may be acquired in future. The law of Louisiana is in accord with the law of her sister States, and of all civilized countries, with regard to mortgages of future property by railroad companies. It is true that Article 3308, Civil Code, declares, "Future property can never be the subject of conventional mortgage," but in *Bell* v. *Chicago, St. Louis &c. Railroad*, 34 La. Ann. 785, it was held that this article applies "only to individuals in their ordinary transactions. It has no reference to juridical persons," governed in this respect by other laws.

II. What meaning and what effect shall be given to the words of the mortgage? Are the lands granted by Congress to the New Orleans, Baton Rouge and Vicksburg Railroad Company covered by the mortgage given by that company to secure payment of its first mortgage construction bonds?

The question as to what property is covered by a mortgage

is purely one of construction, and depends entirely upon the language used and the obvious intention of the parties, to be gathered therefrom, and the authority under which it was issued.

Obviously in determining such a question very little assistance can be had from adjudged cases. Each case must necessarily be determined by its own peculiar circumstances; but it must be borne in mind that under the laws of Louisiana in a *doubtful* case, the agreement is interpreted *against him who has contracted the obligation.* Civil Code, Art. 1957, as amended by Act No. 87 of General Assembly, session of 1871, page 201, Art. 1957, which declares: "In a doubtful case the agreement is interpreted against him who has contracted the obligation."

From the facts and circumstances shown by the record, it is impossible to avoid the conclusion that when the incorporators applied for a charter, and when the legislature granted a charter to the railroad company, both the incorporators and the legislature expected the road and branches to be constructed with moneys derived *exclusively* from the sale of the bonds of the company; that the incorporators desired and intended the legislature should invest the company with power to mortgage its *franchises* and *all its future property,* without exception; that the legislature intended to invest the company with such power, and, in fine, that the main object of both the corporators and the legislature was to make the bonds of the company attractive to capitalists.

The company intended to mortgage and did mortgage *all* of its property within the State of Louisiana of every nature and description whatsoever and *wherever* situated, then owned, or which might thereafter be acquired, together with all its franchises, rights and privileges. A multitude of words was used *ex industria* to convey that intention simply because the draughtsman who framed the act of the legislature incorporating the company was not skilled in the use of words.

The words used in the mortgage were of course intended to mean something. In construing a contract some meaning must be given, when it can properly be done, to all words

found therein. The mortgagor intended to mortgage all property necessarily used for the operation of the line; all property which, though not necessary, was nevertheless used for its operation; and all property appurtenant to the line or any of its branches.

The lands were granted by Congress to aid in the construction of the branch line. They were appurtenant to that line, and could not be diverted from it without fraud. "The words of a law — and of a contract — are generally to be understood in their usual signification, without attending so much to the niceties of grammatical rules as to the general and popular use of the words." Civ. Code. La. Art. 14. This rule is common to all systems of jurisprudence. The word "appurtenant" is thus defined: Webster — Belonging to; Latin, *appertinere ;* from *ad* — to — and *pertinere* — to belong to, to pertain to. Bouvier — Belonging to, pertaining to. These definitions undoubtedly give "the usual signification" of the word — the sense in which it is generally and popularly used.

When appurtenant was used by the legislature of Louisiana in the act of incorporation, and when that word was used in the mortgage, it was used in its usual, general and popular signification. In the civil law that word has no technical meaning. It may have in the common law, but the legislature of Louisiana and the mortgagors, citizens of Louisiana, authorizing and executing a mortgage in Louisiana to have effect only in Louisiana, did not use the word "appurtenant" in any sense in which it may be technical in the common law — they used it to express its *general signification* in the "popular use" of the word. By the use of the words "appurtenant to the line" they meant to convey, and did convey, the idea that all property, real and personal, of whatever description and wheresoever situated, belonging to or pertaining to the line, was to be subject to the mortgage given to secure the payment of the bonds.

Bouvier, after giving the technical meaning of "appurtenant" in the common law, says: "The thing appurtenant must be of an inferior nature to the thing to which it is appurtenant; thus a right of common may be appurtenant, as when

it is annexed to lands in other lordships." Even in this sense the lands granted to aid in the construction of a railroad are appurtenant thereto, the road being the principal thing to which such lands pertain, to which they belong.

The real difference between the opposing parties in the case at bar is this. We say the mortgage in question expressly embraces all property of every kind and description whatsoever and wheresoever situated, then owned, or which might be acquired by the New Orleans, Baton Rouge and Vicksburg Railroad Company, appurtenant to its main line or any of its branches, and we say further that such mortgage was a mortgage of the whole road as a whole thing, with all its corporate franchises and rights, carrying with them all subsequently acquired property.

Our adversaries say the mortgage covers so far as after acquired property is concerned only such as is appurtenant to the *operation* of the line. This idea is always in the mind of our learned opponents. They persistently express it. Nearly all of the cases cited by them in their brief filed in court *a qua* show simply that property not connected with the *opération* of a road is not embraced within the terms of a mortgage granted on property *used* for *operating* a road. This and nothing more was decided in following cases cited on their brief. *Walsh* v. *Barton*, 24 Ohio St. 28; *Farmers' Loan & Trust Co.* v. *Commercial Bank*, 11 Wisconsin, 215; *S. C.* 15 Wisconsin, 424; *S. C,* 82 Am. Dec. 689; *Seymour* v. *Canandaigua & Niagara Falls Railroad*, 25 Barb. 284; *Dinsmore* v. *Racine & Miss. Railroad*, 12 Wisconsin, 725; *Farmers' Loan & Trust Co.* v. *Cary*, 13 Wisconsin, 110. These decisions are sound, but they decide nothing applicable to the case at bar.

A careful study of all the authorities bearing on this case confirms the opinion that the essential question in this case is one purely of interpretation and construction. It depends upon the language used and the intention of the parties, which must be gathered from the act of mortgage and the circumstances attending its execution.

The language used in the mortgage under consideration and the circumstances attending its execution show conclusively that the New Orleans, Baton Rouge and Vicksburg Railroad

Company intended to mortgage and did mortgage all its real estate then owned or which might thereafter be acquired of every kind and description whatsoever and wheresoever situated. The mortgage, then, by its terms, covers the lands granted by Congress to that company "in aid of the construction of the road." Moreover, it is clear that said company by said mortgage mortgaged its road and all branches as a whole thing, together with all its corporate franchises and privileges. If so, future acquired property became subject to the mortgage as an accession to the thing mortgaged.

Under the general law of Louisiana, and under the charter granted to the New Orleans, Baton Rouge and Vicksburg Railroad Company that company was expressly authorized to mortgage its property, and also its corporate franchises, and it did mortgage all its property and also its corporate franchises. Such a mortgage is a mortgage of the corporation as an entirety. It includes all property owned by the corporation and all property subsequently acquired.

Mr. Justice Brown delivered the opinion of the court.

(1) The motion of the plaintiff Parker, to dismiss the appeal as to him upon the ground that less than five thousand dollars is involved, demands our first consideration. His position is that the suit embraces two separate and distinct controversies: one between Parker and appellants, and one between Hamlin and appellants; that there were separate decrees in these several causes; that these decrees cannot be aggregated for the purpose of sustaining the jurisdiction of this court, nor can the appeal be sustained as to him by reason of the fact that, as to Hamlin, more than the requisite jurisdictional amount is at issue. It is true that the amount of Parker's decree was but twenty-four hundred dollars and interest, but his bill was filed not only for himself, but for all the other bondholders under the mortgage, and the cross-bill avers that he actually represented upwards of two hundred of the bonds issued under this mortgage, (an averment admitted by his demurrer,) and prayed for a decree declaring the invalidity of the entire mortgage as to these

lands. Had the bill been filed by the trustee under this mortgage for the foreclosure of the whole amount of the debt, and a similar cross-bill had been filed for its cancellation, there could be no doubt of the appealable character of any decree rendered upon these pleadings. This mortgage, however, contained a provision permitting a foreclosure by any holder of an overdue bond or coupon. Parker's bill was filed practically for the benefit of the entire number of bondholders, and the cross-bill could not be sustained except upon the theory that the entire mortgage was invalid as a lien upon these lands. While a decree in favor of the cross-plaintiff might not have been binding upon any defendant to the cross-bill who did not appear, it certainly would have been binding upon Hamlin as well as Parker, since Hamlin, on being made a plaintiff, expressly stipulated that the cause should be considered as if he had been one of the original plaintiffs; that Parker's pleadings should be considered as his; and that the pleadings of the defendants should apply equally to him. If Parker's argument in this connection be sound, it would necessarily follow that if every bondholder of this mortgage had intervened, and a cross-bill had been filed against them all, praying a cancellation of the entire mortgage, our jurisdiction to review a dismissal of this bill could not be sustained as to any of such bondholders whose decrees were not more than five thousand dollars, notwithstanding it would be sustained as to others whose decrees were larger. The result would be that the land might be sold for the benefit of the larger bondholders, and freed from the lien of the smaller.

Where several plaintiffs claim under the same title, and the determination of the cause necessarily involves the validity of that title, this court has jurisdiction as to all such plaintiffs, though the individual claims of none of them exceed five thousand dollars. Thus in *Shields* v. *Thomas*, 17 How. 3, 4, where a bill was filed by several distributees of an estate, to compel the payment of money alleged to be due them, and a decree was rendered in their favor, it was held that this court had jurisdiction over an appeal, although the amount payable to each individual was less than two thousand dollars. It was

held that the matter in controversy was the amount due the representatives of the deceased collectively; and not the particular sum to which each was entitled, when the amount was distributed among them. Said the court: "They all claimed under one and the same title. They had a common and undivided interest in the claim; and it was perfectly immaterial to the appellant how it was to be shared among them." The case of *Rodd* v. *Heartt*, 17 Wall. 354, is still more nearly analogous. In this case, which was in admiralty, a fund exceeding the jurisdictional amount paid into the registry of the court was claimed on the one hand by several creditors secured by one mortgage, and on the other by a number of mariners and material men. A decree having been made adverse to the mortgagees, an appeal was taken by them to this court, and it was held that although no one of the claims under the mortgage equalled the jurisdictional amount, yet as the claim of the appellants, which was disallowed, exceeded that sum, an appeal would lie. In *The Connemara*, 103 U. S. 754, it was held that where salvors united in a claim for a single salvage service, jointly rendered by them, the owner of the property was entitled to an appeal where the sum decreed exceeded $5000, though in the division among the several parties sharing in the recovery several were awarded less than $5000. In line with these cases are those of *Davies* v. *Corbin*, 112 U. S. 36, and *Handley* v. *Stutz*, 137 U. S. 366.

The true distinction is between cases in which there are several plaintiffs interested collectively under a common title, and those wherein the matters in dispute are separate and distinct, and are joined in one suit for convenience or economy. Of the latter class are those relied upon by the plaintiff Parker in this case, and his motion to dismiss must, therefore, be denied. Indeed the cross-bill to set aside the whole mortgage as to these lands is sufficient of itself to remove all difficulty with regard to our jurisdiction.

(2) The case upon the merits depends upon the question whether the mortgage of 1870 should be construed to cover a land grant made by Congress the following year to the Baton Rouge Company, in aid of the construction of its road. To

answer this question satisfactorily it is necessary to consider the power of this company under its charter, and the manner in which it attempted to exercise this power.

The act of 1869 of the legislature of Louisiana, incorporating the Baton Rouge Company, authorized it (sec. 13) to obtain from any parish or other municipality any rights, privileges or franchises that such municipality might choose to grant in reference to the construction of the road : and by section 14, it was authorized to borrow money or to purchase property for the purpose of constructing the road, to issue its corporate bonds, and, to secure the payment of such bonds, to mortgage its road, etc. By section 15, provision was made for a second mortgage guaranteed by the State, and for bonds to be issued and made payable to the State or bearer. By section 16, the first mortgage that should be given was declared to be a prior lien upon the railroad within the State, including all the " real and personal estate within the State of Louisiana, appurtenant to, or necessary for the operation of said main line of railroad, owned by the company at the date of said mortgage, or which may be acquired by it thereafter; and upon the corporate franchises and privileges of said company, granted by the State of Louisiana, relative to the construction, operation and use of said main line of railroad within the State of Louisiana," etc. The mortgage did not differ materially from this act, though its description of property covered by it is still more explicit, and is as follows : " About five hundred and one miles of railroad within the said State of Louisiana, together with the right of way, road-bed, rails, depots, stations, shops, buildings, machinery, tools, engines, cars, tenders and other rolling stock ; also all the real and personal estate within the State of Louisiana owned by the said company at the date of this mortgage, or which may be acquired by it thereafter, appurtenant to, or necessary for the operation of said main line of said railroad or any of said branches connected with the said main line, or to be connected therewith ; also all other property, real and personal, of every kind and description whatsoever and wherever situated in the State of Louisiana which is now owned or which shall hereafter be acquired by the said company, and

which shall be appurtenant to or necessary or used for the operation of said main line of railroad, or of any of said branches; also the tenements, hereditaments and appurtenances thereunto belonging, and all of the estate, right, title and interest, legal and equitable, of the said company and its successors and assigns therein, together with the corporate franchises and privileges of said company at any time granted or to be granted by the State of Louisiana relative to the construction, operation and use of said railroad within said State." The bonds issued under this mortgage contained a similar description of the property, the latter clause of such description, however, purporting to include "the corporate franchises and privileges of said company granted by the State of Louisiana *or by act of Congress*, relative to the construction," etc. How these words, "or by act of Congress," came to be inserted in the bonds does not appear; it may have been an oversight, or the company may have supposed that the land grant would be acquired and that the insertion of these words would impart additional currency to the bonds. It is not material, however, to determine why or how this was done, since neither the act of the legislature nor the mortgage itself assumed in terms to cover anything granted by the act of Congress.

The language of the act of the legislature and of the mortgage itself restricts its lien to real and personal property situated in the State of Louisiana, then owned or which should thereafter be acquired, and which should be appurtenant to, or necessary, or used for the operation of the main line of said road, or any of its branches. The succeeding clause, which includes tenements, hereditaments and appurtenances thereunto belonging, etc., was manifestly not intended as an expansion of the prior clause, and for the purposes of this case may be treated as superfluous. No argument is needed to show that a land grant is not necessary to the operation of a railroad; it may be a necessary aid in the construction of a road, but it is certainly not necessary in its operation. Plaintiff's contention, then, if supportable at all, must be upon the theory that the land grant was appurtenant to the road, not necessa-

rily to its operation, but to the road itself. The word "appurtenant," as ordinarily defined, is that which belongs to or is connected with something else to which it is subordinate or less worthy, and with which it passes as an incident, such as an easement or servitude to land; the tackle, apparel, rigging and furniture to a ship; a right of common to a pasture; or a barn, garden or orchard to a house or messuage. In a strict legal sense it is said that land can never be appurtenant to land, *Jackson* v. *Hathaway*, 15 Johns. 447, 454.; *Leonard* v. *White*, 7 Mass. 6; *Woodhull* v. *Rosenthal*, 61 N. Y. 382; but it was evidently contemplated by this mortgage that real as well as personal property subsequently acquired, such as land for stations, machine shops or other purposes immediately connected with the road, should pass under the lien of the mortgage. Property, however, not connected with what is ordinarily termed the plant, or not forming a part of the organic structure of the road, is never treated as appurtenant to it. Thus in *Humphreys* v. *McKissock*, 140 U. S. 304, decided at the last term of this court, it was held that a railroad company joining in the construction of an elevator upon land not belonging to it, and situated at some distance from its road, did not by its ownership of stock in the elevator company acquire such an interest in it as would pass as an appurtenance under the mortgage of the road, as constructed or to be constructed, and the "appurtenances thereunto belonging." The court went further, and held that the elevator itself, if owned by the company, would not be appurtenant to its road. In line with this are the earlier cases of *Harris* v. *Elliott*, 10 Pet. 25, holding that the soil and freehold of a street did not pass as appurtenant to a lot of land fronting upon such street. So in *Linthicum* v. *Ray*, 9 Wall. 241, it was said that the right to use a wharf would not pass as appurtenant to a lot, as it was not in any way connected with the enjoyment or use of the lot, and a right not so connected could not be annexed as an incident to land so as to become appurtenant to it. In *Smith* v. *McCullough*, 104 U. S. 25, a mortgage executed by a railroad company upon its then and thereafter to be acquired property contained a specific description of such property, and was

held not to cover municipal bonds issued to it in building the road, which were not embraced in such description. And in *Bank* v. *Tennessee*, 104 U. S. 493, where a bank was required by its charter to pay a certain tax in lieu of all other taxes, and was authorized to purchase and hold a lot of ground for its use "as a place of business," and hold such real property as might be conveyed to it to secure its debts, it was held that the immunity from taxation extended only to so much of the building as was required by the actual needs of the bank in carrying on its business. See also *Tucker* v. *Ferguson*, 22 Wall. 527.

Analogous cases in the state courts are numerous. Thus in *Parish* v. *Wheeler*, 22 N. Y. 494, it was held that canal boats purchased with the funds of a railroad company, and used and run by it in connection with its railroad, but beyond its terminus, were not covered by a mortgage of its engines, cars, etc., "and all other personal property in any way belonging or appertaining to the railroad of said company." So in *Boston & New York Air-Line Railroad* v. *Coffin*, 50 Connecticut, 150, the property mortgaged by the railroad company was described very nearly in the terms employed in the mortgage under consideration, and it was held that lands purchased by the company outside of the lay-out of the road, and not needed for its use or construction, were not covered by the mortgage. It was said in the opinion, that "lands purchased and sold at a profit, although the profit might be expended in the construction of the road, were never intended to be embraced by the phrase, 'acquired by the company for the purposes of the railroad.'" In *Mississippi Valley Co.* v. *Chicago, St. Louis & New Orleans Railroad*, 58 Mississippi, 846, a railroad mortgage covering property thereafter to be acquired was confined to such as was appurtenant to or necessary for building or operating the road, and carrying out the purposes for which it was created, and was held not to include a hotel and brick storehouse, some vacant town lots and a farm of three hundred acres; the hotel being used as a railroad eating-house, and the other property being rented out for the several purposes for which it was adapted. In *Meyer*

v. *Johnston*, 53 Alabama, 237, *S. C.* 64 Alabama, 603, a mortgage of a railroad and "all other property now owned, and which may be hereafter owned by the railroad company," was held not to cover a land grant of the United States made by an act of Congress subsequently passed. Other cases to the same purport are: *Shamokin Valley Railroad Co. v. Livermore*, 47 Penn. St. 465; *Dinsmore* v. *Racine &c. Railroad Company*, 12 Wisconsin, 725; *Farmers' Loan &c. Company* v. *Commercial Bank*, 11 Wisconsin, 207; *S. C.* 15 Wisconsin, 424; *Morgan* v. *Donovan*, 58 Alabama, 241; *Walsh* v. *Barton*, 24 Ohio St. 28; *Calhoun* v. *Memphis & Paducah Railroad*, 2 Flippin, 442; *Seymour* v. *Canandaigua & Niagara Falls Railroad*, 25 Barb. 284.

A consideration of the circumstances attending and following the execution of this mortgage strengthens the inference that we have drawn from it, that the land grant was not intended to be included. There is no allegation in the bill that the parties to this mortgage expected, or had any reason to expect that the land grant would be made; and had it been intended to include so important an item, it is scarcely possible that the mortgagor would have left such intention to be inferred from the indefinite and ambiguous language of this instrument. Nor is there any evidence that, after the act of Congress was passed, the line of the road was ever definitely fixed, as contemplated by section 9 of the act of March 3, 1871, 16 Stat. c. 122, 573, 576, although it had filed a map designating the general route of the road pursuant to sections 12 and 22, and obtained an order from the Secretary of the Interior withdrawing from entry and sale the odd-numbered sections of land within the grant and indemnity limits. As the grant was, by section 9, of lands not sold, reserved or otherwise disposed of at the time the route of the road was definitely fixed, it is settled in this court that the title to any particular lands would not pass until the line was so located, because until that time it could not be definitely ascertained what lands had been otherwise disposed of. *Van Wyck* v. *Knevals*, 106 U. S. 360; *Kansas Pacific Railway* v. *Dunmeyer*, 113 U. S. 629; *Sioux City Land Co.* v. *Griffey, ante*, 32. As to lands

within the indemnity limits, it has always been held that no title is acquired until the specific parcels have been selected by the grantee, and approved by the Secretary of the Interior. *Grinnell* v. *Railroad Company*, 103 U. S. 739; *Kansas Pacific Railroad* v. *Atchison, Topeka &c. Railroad*, 112 U. S. 414, 421; *St. Paul &c. Railroad* v. *Winona & St. Peter Railroad*, 112 U. S. 720; *Barney* v. *Winona & St. Peter Railroad*, 117 U. S. 228; *United States* v. *Missouri &c. Railway*, 141 U. S. 358, 375; *St. Paul &c. Railroad* v. *Northern Pacific*, 139 U. S. 1. A definite location of this line was subsequently made by the Pacific Company; but there is no evidence that such location coincided with the general route designated by the Baton Rouge Company, and as no patents were ever issued for the lands earned by the construction of the road until March, 1885, when they were issued to the Pacific Company as assignee of the Baton Rouge Company, it is difficult to see what lands were ever "acquired" by the latter company, to which this mortgage would attach:

Not only this, but there is no allegation or evidence that the Baton Rouge Company paid the cost of surveying, selecting and conveying these lands, as required by the act of July 31, 1876, 19 Stat. c. 246, 102, 121, as a preliminary to their conveyance. *New Orleans Pacific Railway* v. *United States*, 124 U. S. 124; *Deseret Salt Co.* v. *Tarpey*, 142 U. S. 241. Nor is there any evidence to show that the Baton Rouge Company ever built any of its line of road or did anything to earn or acquire the title to any part of its land grant.

(3) The decrees in this case were also fatally defective in ordering all the lands assumed to be covered by this mortgage to be sold, free from all liens, mortgages and incumbrances, to satisfy a claim of $2400 in one case and $6000 in another, without making provision for other bondholders, subsequent mortgagees, or other creditors of the road. Assuming for the purposes of this case that, under the peculiar terms of this mortgage, these bondholders had the right to file this bill without calling upon the trustee to act — a point upon which we express no opinion — they had no right to a decree for their exclusive benefit. If a single bondholder has any right

at all to institute proceedings, he is bound to act for all standing in a similar position, and not only to permit other bondholders to intervene, but to see that their rights are protected in the final decree.   Upon this principle it was held by this court, in *Pennock* v. *Coe*, 23 How. 117, that a bondholder cannot, by getting a judgment at law, be permitted to sell a portion of the property devoted to the common security, as this would disturb the *pro rata* distribution among the bondholders to which they are equitably entitled.   "These bondholders," said Mr. Justice Nelson, "have a common interest in this security, and are all equally entitled to the benefit of it; and in case of a deficiency of the fund to satisfy the whole of the debt, in equity, a distribution is made among the holders *pro rata.*  .  .  .   To permit, therefore, one of the bondholders under the second mortgage to proceed at law in the collection of his debt upon execution would not only disturb the *pro rata* distribution in case of a deficiency, and give him an inequitable preference over his associates, but also have the effect to prejudice the superior equity of the bondholders under the first mortgage, which possesses the prior lien."   Jones on Railroad Securities, sections 392, 393, 434; *Fish* v. *N. Y. Water-Proof Paper Co.*, 29 N. J. Eq. 16; *Martin* v. *Mobile & Ohio R. R. Co.*, 7 Bush, 116.

In *Railroad Company* v. *Orr*, 18 Wall. 471, 475, a bill was filed by a bondholder, on behalf of himself and all others, against a county and a railroad company for the foreclosure of a mortgage given by the railroad company to secure the redemption of certain bonds issued by the county, and for a sale of the mortgaged property.   The railroad company demurred for want of proper parties.   It was held that the other bondholders should be parties to the suit, and, in delivering the opinion of the court, Mr. Justice Hunt observed: "It is the interest of every bondholder to diminish the debt of every other bondholder.   In so far as he succeeds in doing that, he adds to his own security.   Each holder, therefore, should be present, both that he may defend his own claims and that he may attack the other claims should there be just occasion for it.   If upon a fair adjustment of the amount of the debts there

should be a deficiency in the security, real or apprehended, every one interested should have notice in advance of the time, place and mode of sale, that he may make timely arrangements to secure a sale of the property at its full value."

In the view we have taken of the case it is unnecessary to consider the other points made by the defence. We are satisfied, both from the words of the mortgage itself, and from the circumstances attending its execution, that it should not be construed to include the land grant subsequently made to this company.

The decrees of the court below must be

*Reversed, and the case remanded with instructions to dismiss the bills of Parker and Hamlin, and for further proceedings in conformity with this opinion.*