## WEYERHAEUSER *v.* HOYT.

### APPEAL FROM THE CIRCUIT COURT OF APPEALS FOR THE EIGHTH CIRCUIT.

No. 24. Argued April 27, 28, 1910.—Restored to docket for reargument December 19, 1910.—Reargued January 19, 20, 1911.—Decided February 20, 1911.

It was the purpose of Congress, as evidenced by the original Northern Pacific Land Grant Act of July 2, 1864, c. 217, 13 Stat. 365, and the joint resolution of May 31, 1870, 16 Stat. 378, extending the indemnity limits, to confer substantial rights to the lands within the indemnity limits in lieu of those lost within place limits.

The right of the company to lieu lands lawfully embraced in selections filed with the Secretary of the Interior excluded lands to which rights of others had attached before the selection and also excluded

the right of others to appropriate lands so embraced in such selections pending action by the Secretary.

The power of the Secretary to approve selections is judicial in its nature, and implies the duty to determine as of the time of filing the selection and the doctrine of relation applies to decisions as to validity of such selections.

In this case *held,* that the company's rights to lieu lands embraced in a selection were superior to those of a purchaser under the Timber and Stone Act who filed pending final decision by the Secretary and between the time of decision of the Secretary holding that the selections were unlawful and the subsequent reversal of that decision; and that the final decision related back to the date of the original selection. *Sjoli* v. *Dreschel,* 199 U. S. 564, distinguished.

General expressions in every opinion are to be taken in connection with the case in which those expressions are used. If they go beyond the case, they may be respected, but they are not controlling when the very point is presented in a subsequent case.

General expressions in an opinion such as those in *Sjoli* v. *Dreschel,* 199 U. S. 564, will not be made the basis for overthrowing a uniform rule of the Land Department, involving destructive effects upon property rights existing under different conditions.

The contention in this case, overruled by the Secretary, that the company was not entitled to lieu lands within indemnity limits because not on the same side of railroad as the place lands lost, held to be without merit.

Where a matter regarding selection of lieu land is wholly within the jurisdiction of the Secretary deciding it, this court will assume that the facts on which the decision rested were properly proved.

*Humbird* v. *Avery,* 195 U. S. 485, followed as to construction of provisions of Sundry Civil Act of July 1, 1898, c. 546, 30 Stat. 597, 620, and decision of Secretary in this case sustained; but *quære* and not decided, as to effect of such provisions on purchasers under the Timber and Stone Act.

Where the object of the bill is to charge the defendant as trustee of land included in lieu limits of a railway grant for the complainant, if it appears that a valid selection was made, proof that defendant's grantor never acquired title to the land would not establish complainant's right to it.

161 Fed. Rep. 324, reversed.

THE facts, which involve the construction of the Northern Pacific Land Grant Acts, are stated in the opinion.

*Mr. Charles W. Bunn* and *Mr. Frank B. Kellogg*, with whom *Mr. Stiles W. Burr* was on the brief, for appellants in No. 24 and appellees in No. 12.

*Mr. Charles W. Bunn* for plaintiffs in error in No. 181.

*Mr. M. H. Stanford* for appellees in No. 24 and appellants in No. 12.

*Mr. P. B. Gorman* for defendant in error in No. 181.[1]

MR. CHIEF JUSTICE WHITE delivered the opinion of the court.

Conflicting claims to forty acres of land in the State of Minnesota is the controversy which this case involves. Both parties assert title derived from the United States, the appellants in virtue of a patent issued under a land grant made to the Northern Pacific Railroad Company and the appellees as the result of an alleged purchase under the timber and stone act. The facts are these:

The Northern Pacific Railroad Company in 1883 filed in the Land Department a list of indemnity selections which embraced the land in question. In 1893 a rearranged list was filed, differing from the previous one, in that it specified the particular tract of land lost in the place limits for which each described selection within the indemnity limits was made. The Land Department having ruled that the eastern terminus of the Northern Pacific Railroad Company was not at Ashland but at Duluth, a point west of Ashland, the selections, so far as they related to lands east of Duluth, among which was the land in con-

---

[1] This case was argued simultaneously with No. 12, *Campbell* v. *Weyerhaeuser*, *post*, p. 424, and *Northern Pacific Railway Company* v. *Wass*, *post*. p. 426.

troversy, were cancelled by order of the Secretary of the Interior. Following this, in December of that year, Richard B. Jones applied to purchase the land under the timber and stone act. A few months after, on February 28, 1898, the Secretary of the Interior made an order formally withdrawing from entry the selected land east of Duluth in order, as was declared, to preserve the right of the railroad company, if any, resulting from the selections previously filed, pending the decision by this court of cases involving whether the eastern terminus was at Duluth or at Ashland. About nine months after this withdrawal, in December, 1898, Jones made his final proof and paid the purchase money, one hundred dollars. The receiver of the local land office, however, recited in the receipt issued to Jones that his rights were "subject to any claim the Northern Pacific Railroad Company may have to the lands herein described."

In 1900 (*Doherty* v. *Northern Pacific Ry. Co.*, 177 U. S. 421, 435) it was decided that the eastern terminus of the Northern Pacific Railroad was at Ashland, and therefore that the Land Department had erred in holding that such terminus was at Duluth. The Secretary of the Interior then formally reinstated the list of selections previously filed by the railroad company, the entry of Jones was cancelled, and the selections were approved and patents issued to the Northern Pacific Railway Company as entitled to all rights under the selections. The railway company conveyed the tract in controversy to Weyerhaeuser and Humbird, the present appellants.

This suit was then begun by Hoyt in a court of the State of Minnesota against Weyerhaeuser and Humbird to compel a conveyance of the land and to restrain the cutting or removal of timber during the pendency of the suit, on the ground that the title was held by the defendants in trust for complainant. The right to relief was principally based upon the contention that the purchase by Jones under the

timber and stone act was paramount to the indemnity selection previously made by the railroad company, and hence that the Land Department had fallen into an error of law in patenting the land to the company. In addition there were numerous other grounds upon which the right to relief was predicated, but we do not deem it necessary now to detail them, as we shall come to state and dispose of them after we have passed upon the contention concerning the paramount nature of the timber and stone entry. The case having been removed into a Circuit Court of the United States, upon the ground that on the face of the bill it involved the construction of acts of Congress, was in that court tried and a decree was entered dismissing the bill. The Circuit Court of Appeals, whose action is now under review, reversed the decree of the Circuit Court and remanded the cause with directions to enter a decree for the complainant granting the relief prayed. 161 Fed. Rep. 324.

The decision of the court was based upon the conclusion that the application to purchase made by Jones, although subsequent in date to the filing by the railroad company of its list of indemnity selections, was paramount to such selections, even although they had been subsequently approved by the Secretary of the Interior. This was not, however the result of an interpretation originally considered of the granting act, but was exclusively caused, as shown by the opinion of the court, by what was held to be the authoritative and controlling operation of a decision of this court. *Sjoli* v. *Dreschel,* 199 U. S. 564. The soundness of this view lies at the threshold of the case, since, if it be that the rights of the parties are authoritatively concluded by the ruling in the *Sjoli case,* it will not be necessary to further consider the subject. Coming at once to analyze the ruling in the *Sjoli case* in order to fix its true import, we think it is apparent that the court below was mistaken in holding that the decision was here au-

thoritatively decisive. This is said because we see, no escape from that conclusion when the issues in the *Sjoli case* are accurately ascertained and‧are compared with those here presented.

The Sjoli controversy, succinctly stated, thus arose: A homestead settler went in 1884 upon land within the indemnity limits of the grant to the Northern Pacific Railroad Company. He erected a dwelling-house and moved into it with his family and cultivated a portion of the land, all prior to the filing in 1885 of a list of selections by the railroad company, embracing the tract settled upon by Sjoli. Although the settler had thus prior to the filing of the list of selections entered upon and improved the land with the intention of perfecting title under the homestead laws, his application to enter, for reasons which need not be here adverted to, was not made until subsequent to the filing by the railroad company of its list of selections. Relying upon this fact, the railroad company opposed the application of Sjoli, and the proceedings which took place in the Land Department simply required the department to determine whether the railroad company, by the filing of its list of selections, could deprive the settler Sjoli of his rights, despite the fact that his settlement and improvement of the land had occurred prior to the filing by the company of its list of selections. The Land Department decided in favor of the settler, and a patent was issued to him.

The matter decided by this court in the *Sjoli case* arose from the bringing of a suit by Dreschel, as assignee of the rights of the railroad company, asserting that Sjoli held the land in trust for him as the grantee of the railway company, because the Land Department had, as a matter of law, erred in deciding that the rights of the settler Sjoli were paramount to the subsequent selection by the railroad company, since at the time of the filing of such list of selections no record evidence existed in the Land

Department of the asserted settlement by Sjoli or of his intention to avail of the benefit of the homestead laws. The action of the Land Department in maintaining the paramount right of the settler was sustained. As it is manifest from the statement we have made that the controversy in this case involves no question whatever concerning the rights of a settler initiated prior to the filing by the railroad company of its list of selections, but simply calls upon us to determine whether the Land Department erred in deciding that a filed list of selections was after approval paramount to a subsequent application to purchase, it is at once demonstrated that the question here involved is wholly different from that which was decided in the *Sjoli case.* This difference is as wide as that which would exist between a ruling that one who was prior in time was prior in right, and a directly antagonistic decision that one who was subsequent in time was yet prior in right. And the broad distinction which obtains between the matter which was involved and decided in the *Sjoli case* and the question presented on this record is made, if need be, more apparent when it is considered that in the *Sjoli case* the action of the Land Department in issuing the patent to the settler, because he was prior in time was sustained, while to hold that decision applicable here would reverse the action of the Land Department in issuing a patent to the railway company because it was prior in time. While in view of this difference between the issues involved in the *Sjoli case* and those here arising, we are constrained to the conclusion that the former case cannot be held to be here authoritatively decisive, of course the due persuasive force of the reasoning of the opinion in the *Sjoli case* if here applicable remains, and must be considered when we come, as we now do, to pass upon the controversy here arising, enlightened by the true interpretation of the granting act as elucidated by the applicable decisions of this court.

It is beyond dispute on the face of the granting act of July 2, 1864, c. 217, 13 Stat. 365, 367, and of the joint resolution of May 31, 1870, c. 67, 16 Stat. 378, extending the indemnity limits, that it was the purpose of Congress in making the grant to confer a substantial right to land within the indemnity limits in lieu of lands lost within the place limits. It is also beyond dispute that as the only method provided by the granting act for executing the grant in this respect was a selection of the lieu lands by the railroad company subject to the approval of the Secretary of the Interior that a construction which would deprive the railroad company of its substantial right to select and would render nugatory the exertion of power of the Secretary of the Interior to approve lawful selections when made would destroy the right which it was the purpose of Congress to confer. That the effect of holding that lands lawfully embraced in a list of selections duly filed and awaiting the approval of the Secretary of the Interior could, in the interim, be appropriated at will by others would be destructive of the right of selection, is not only theoretically apparent from the mere statement of the proposition, but has moreover in actual experience been found to be the practical result of carrying that doctrine into effect. See 25 Opin. Atty. Gen. 632. Considering the language of the granting act from a narrower point of view a like conclusion is in reason rendered necessary. The right to select within indemnity limits was conferred to replace lands granted in place which were lost to the railroad company because removed from the operation of the grant of lands in place by reason of the existence of the rights of others originating before the definite location of the road. The right to select within indemnity limits excluded lands to which rights of others had attached before the selection, and hence simply required that the selection when made should not include lands which at that time were subject to the rights of others. The requirement

of approval by the Secretary consequently imposed on that. official the duty of determining whether the selections were lawful at the time they were made, which is inconsistent with the theory that any one could appropriate the selected land pending action of the Secretary. The scope of the power to approve lists of selections conferred on the Secretary was clearly pointed out in *Wisconsin Central Railroad* v. *Price,* 133 U. S. 496, 511, where it was said that the power to approve was judicial in its nature. Possessing that attribute the authority therefore involved not only the power but implied the duty to determine the lawfulness of the selections as of the time when the exertion of the authority was invoked by the lawful filing of the list of selections. This view, while it demonstrates the unsoundness of the interpretation of the granting act which the contrary proposition involves, serves also at once to establish that the obvious purpose of Congress in imposing the duty of selecting and submitting the selections when made to the final action of the Secretary of the Interior, was to bring into play the elementary principle of relation, repeatedly sanctioned by this court and uniformly applied by the Land Department from the beginning up to this time under similar circumstances in the practical execution of the land laws of the United States. Without attempting to cite the many cases in this court illustrating and applying the doctrine, a few only which are aptly pertinent and here decisive are referred to. *Gibson* v. *Chouteau,* 13 Wall. 92, 100; *Shepley* v. *Cowan,* 91 U. S. 330; *St. Paul Railroad* v. *Winona Railroad,* 112 U. S. 720, 733; *Oregon & C. R. R.* v. *United States,* 189 U. S. 103, 112; *United States* v. *Detroit Lumber Co.,* 200 U. S. 321. 334, and cases cited.

In *Shepley* v. *Cowan* there was conflict between a preemption claim and a selection on behalf of the State of Missouri under an act of Congress conveying to the State a large quantity of land to be selected by the governor,

the act providing that if the selection should be approved by the Secretary of the Interior patents were to issue. The court said (p. 337):

·"The party who takes the initiatory step in such cases, if followed up to patent, is deemed to have acquired the better right as against others to the premises. The patent which is afterward issued relates back to the date of the initiatory act, and cuts off all intervening claimants. Thus the patent upon a state selection takes effect as of the time when the selection is made and reported to the land office; and the patent upon a preëmption settlement takes effect from the time of the settlement as disclosed in the declaratory statement or proofs of the settler to the register of the local land office."

On page 338, after distinguishing *Frisbie* v. *Whitney*, 9 Wall. 187, and *Yosemite Valley Case*, 15 Wall. 77, the court said:

. "But whilst, according to these decisions, no vested right as against the United States is acquired until all the prerequisites for the acquisition of the title have been complied with, parties may, as against each other, acquire a right to be preferred in the purchase, or other acquisition of the land when the United States have determined to sell or donate the property. In all such cases the first in time in the commencement of proceedings for the acquisition of the title, when the same are regularly followed up, is deemed to be the first in right."

In *St. Paul Railroad* v. *Winona Railroad*, 112 U. S. 720, one of the questions arising for decision was which of two railroad companies was entitled to certain tracts of lieu lands situated within overlapping indemnity limits of certain grants made by an act of Congress to the Territory of Minnesota, to aid in the construction of the roads of the contesting companies. The selections were to be made by the governor, and required the approval of the Secretary of the Interior. The Winona company filed a list of selec-

tions.   The St. Paul company made no selections, but
nevertheless, on grounds which need not be stated, the Sec-
retary of the Interior certified the lands to the State for the
use of that company.   The Winona company brought suit
in the state court to have a declaration of its rights in the
land, and to restrain the St. Paul company and others from
receiving a patent or other evidence of title to the lands
from the governor of the State.   The state court decreed in
favor of the Winona company, and this court affirmed its
action.   In the course of the opinion it was said (page 731):

"The time when the right to lands becomes vested,
which are to be selected within given limits under these
land grants, whether the selection is in lieu of lands defi-
cient within the primary limits of the grant or of lands
which for other reasons are to be selected within certain
secondary limits, is different in regard to those that are
ascertained within the primary limits by the location of
the line of the road."

After referring to prior decisions the conclusion was
reached that, as to the lands to be selected, "priority of
selection secures priority of right," and that as the Winona
company alone had made selection of the lands, and that
selection was lawful, the right to the land as against third
parties vested in the Winona company as of the date of the
filing of its lists of selections.   In concluding the opinion
it was said (p. 733):

"It is no answer to this to say that the Secretary of the
Interior certified these lands to the State for the use of the
appellant.  It is manifest that he did so under a mistake
of the law, namely, that appellant, having made the ear-
lier location of its road through these lands, became en-
titled to satisfy all its demands, either for *lieu* lands or for
the extended grant of 1864, out of any odd sections within
twenty miles of that location, without regard to its prox-
imity to the line of the other road.   We have already
shown that such is not the law, and this erroneous de-

cision of his cannot deprive the Winona company of rights which became vested by its selection of those lands. *Johnson* v. *Towsley,* 13 Wall. 72, 80; *Gibson* v. *Chouteau,* 13 Wall. 92, 102; *Shepley* v. *Cowen,* 91 U. S. 330, 340; *Moore* v. *Robbins,* 96 U. S. 530, 536."

So, also, in *Oregon & C. R. R.* v. *United States,* 189 U. S. 103, the court said (p. 112):

"Now, it has long been settled that while a railroad company, after its definite location, acquires an interest in the odd-numbered sections within its place or granted limits—which interest relates back to the date of the granting act—the rule is otherwise as to lands within indemnity limits. As to lands of the latter class, the company acquires no interest in any specific sections until a selection is made with the approval of the Land Department; and then its right relates to the date of the selection. And nothing stands in the way of a disposition of indemnity lands, prior to selection, as Congress may choose to make."

The doctrine thus affirmatively established by this court as we have said has been the rule applied by the Land Department in the practical execution of land grants from the beginning. *Porter* v. *Landrum,* 31 L. D. 352; *Southern Pacific Railroad Co.,* 32 L. D. 51; *Santa Fe Pacific Railroad Co.,* 33 L. D. 161; *Eaton* v. *Northern Pacific Railway Co.,* 33 L. D. 426; *Santa Fe Pacific Railroad Co.* v. *Northern Pacific Railway Co.,* 37 L. D. 669. The well-settled rule of the Land Department on the subject was thus stated by the then Assistant Attorney General in the Department, now Mr. Justice Van Devanter as follows:

"Under this legislation the company was, by the direction or regulations of the Secretary of the Interior, required to present at the local land office selections of indemnity lands, and these selections, when presented conformably to such direction or regulations, were to be entertained and noted or recognized on the records of the local office. When this was done the selections became lawful filings;

and while, until approved and patented, they would remain subject to examination, and to rejection or cancellation where found for any reason to be unauthorized, they, like all other filings, were entitled to recognition and protec-. tion so long as they remained undisturbed upon the records.

"There is no question in this case as to the sufficiency of the loss assigned, or as to the formality and regularity of the selection.

"What effect has been given to a pending railroad indemnity selection?

"Prior to 1887 the rights of a railroad company within the indemnity belt of its grant were protected by executive withdrawal, but on August 15, that year, these withdrawals were revoked, and the land restored to settlement and entry; but such orders, although silent upon the subject, were held not to restore lands embraced in pending selections. *Dinwiddie* v. *Florida Railway & Navigation Co.*, 9 L. D. 74. In the circular of September 6, 1897, (6 L. D. 131), issued immediately after the general revocation of indemnity withdrawals, it was provided that any application thereafter presented for lands embraced in a pending railroad indemnity selection, and not accompanied by a sufficient showing that the land was for some cause not subject to the selection, was not to be accepted, but was to be held subject to the claim of the company under such selection. In fact, a railroad indemnity selection, presented in accordance with departmental regulations and accepted or recognized by the local officers, has been uniformly recognized by the land department as having the same segregative effect as a homestead or other entry made under the general land laws."

Despite the doctrine of this court as expounded in the cases previously referred to, the unbroken practice of the Land Department from the beginning in the execution of land grants, impliedly sanctioned by Congress during the

many years that administrative construction has prevailed, and the destructive effect upon rights conferred by land-grant acts which would result from applying the contrary view, it is yet urged that this must be done because of decisions of this court which it is insisted constrain to that conclusion. One of the decisions thus referred to is *Sjoli* v. *Dreschel*, 199 U. S. 564, to which we have previously referred, and others are cited in the margin.[1]

What we have already said as to the *Sjoli case* would suffice to dispose of the suggestion concerning that case, but we shall recur to it. As to the other cases, it would be adequate to say that not one of them involved the question here under consideration nor even by way of *obiter* was an opinion expressed on such question. Indeed, all the cases relied upon may be placed in one of three classes: *a*, those involving the nature and character of the right, if any, to indemnity lands prior to selection; *b*, whether such lands, after the filing of a list of selections and before action by the Secretary of the Interior thereon, could be taxed by a State to the railroad company as the owner thereof; and, *c*, those which were concerned with the nature and character of acts which were adequate to initiate a right to public land which would be paramount to a list of selections when the acts were done before the filing of the list of selections. In none of the cases, moreover, was the well-settled doctrine of this court as to relation, even by remote implication, questioned. Indeed, in most of the cases relied upon the previous decisions to which we have referred to expounding the doctrine of relation were approvingly cited or expressly reaffirmed.

---

[1] *Ryan* v. *Central Pacific R. R. Co.*, 99 U. S. 382; *Kansas Pacific R. R. Co.* v. *Atchison &c. R. R. Co.*, 112 U. S. 414; *Kansas P. R. R. Co.* v. *Dunmeyer*, 113 U. S. 629, 639, 644; *Wisconsin C. R. Co.* v. *Price County*, 133 U. S. 496, 511; *United States* v. *Missouri &c. Ry.*, 141 U. S. 359, 374, 375; *New Orleans Pacific Ry. Co.* v. *Parker*, 143 U. S. 42, 57; *Hewitt* v. *Schultz*, 180 U. S. 139.

The Sjoli case, from the facts we have already stated, is clearly here inapplicable, because it falls in the third of the above classes. If it be conceded that general language was used in the opinion in that case which when separated from its context and disassociated from the issues which the case involved, might be considered as here controlling, that result could not be accomplished without a violation of the fundamental rule announced in Cohens v. Virginia, 6 Wheat. 399, so often since reiterated and expounded by this court, to the effect that "General expressions in every opinion are to be taken in connection with the case in which those expressions are used. If they go beyond the case, they may be respected, but ought not to control the judgment in a subsequent suit when the very point is presented for decision." The wisdom of the rule finds apt illustration here when it is considered that not even an intimation was conveyed in the Sjoli case of any intention to overrule the repeated prior decisions of this court concerning the operation and effect of the doctrine of relation upon the approval, by the Secretary of the Interior, of a lawful list of selections. That the general expressions in the Sjoli case are not persuasive here clearly results from the demonstration which we have previously made that to apply them would be in effect to destroy the indemnity provisions of the granting act. Moreover, that serious general injurious consequences would arise from treating the expressions relied upon in the Sjoli case as persuasive is clear, (a) because to do so would result in the overthrow of the uniform rule by which the Land Department has administered land grants from the beginning, a rule continued in force after the decision in the Sjoli case, because of the administrative conclusion that that case should be confined to a like state of facts and not be extended to other and different conditions (25 Opin. Atty. Gen. 632); (b) because of the destructive effect upon rights of property and the infinite confusion which would now arise from

extending, under the circumstances stated, the observations in the *Sjoli case* to the wholly different state of facts presented upon this record.

While the foregoing disposes of the main propositions which the case presents, there are additional contentions which it is necessary to pass upon. Irrespective of any question as to the paramount nature of a list of selections, it is contended on behalf of appellee, contrary to the ruling of the Secretary of the Interior: *a*, that the selection by the railroad company of the tract in controversy was void and it could not lawfully be approved; *b*, in any event that he was entitled to the land by virtue of the provisions of an act approved July 1, 1898, c. 546, 30 Stat. 620; and, *c*, the Northern Pacific Railway Company did not succeed to the rights of the Northern Pacific Railroad Company in the land, if any right thereto became vested in the latter company.

*a*. This contention is predicated upon the claim that the selecting company had not sustained a legal loss of the tract in lieu of which the land in controversy was selected, and that if it had sustained the loss the selection was not lawful, because the tract selected was not on the same side of the railroad as the tract lost and was not the nearest unappropriated land to it. These contentions were considered at much length by the Secretary of the Interior in the opinion, copied in the record, affirming the cancellation of the entry of Jones (34 L. D. 105) and were found not to be meritorious. The reasons advanced by the Secretary in support of his rulings upon the legal propositions involved seem to us convincing, and we therefore hold the contentions untenable. Cognate to the contentions just disposed of is a claim made in argument that the filed list of selections was void for the reason that the joint resolution of May 31, 1870, establishing the second indemnity limits, required certain facts to appear in order to entitle the railway company to the land, and that in selecting the

land those requisites were not complied with. The claim substantially embodies merely criticisms directed to the form or regularity of the selection list, and is not, in any view, of such a character as to render void the filed list. The matter being within the jurisdiction of the Secretary of the Interior, we must assume that the facts necessary to establish the right to approve the selections were shown to his satisfaction.

*b.* This contention asserts that complainant is entitled to the land by virtue of certain provisions relating to the Northern Pacific land grant contained in the subdivision entitled, "Surveying the Public Lands," embodied in the Sundry Civil Appropriation Act of July 1, 1898. The provisions are copied in the opinion in *Humbird* v. *Avery*, 195 U. S., beginning at page 485, and need not be here repeated. As there said, they "disclose a scheme or plan for the settlement of the disputes arising out of the conflicting rulings in the Land Department in reference to the eastern terminus of the railroad, and its action in reference to the public lands between Duluth and Ashland." It is argued that the Secretary of the Interior erroneously decided that the land could not be claimed under the act of 1898 by Jones or his grantee, because prior to January 1, 1898, Jones had done nothing more than to file his application for the land, and was consequently not a purchaser entitled to the benefits of the statute. In our opinion no error was committed by the Secretary in so deciding. Because we reach this conclusion we must not be considered as intimating any opinion whatever regarding the soundness of the contention made on behalf of the appellants, to the effect that in any event the act of 1898 can have no application to one who purchased land under the timber and stone act.

*c.* It is contended that the Northern Pacific Railway Company, under its charter, had no power to purchase the tract of land here in controversy, and that for various reasons the legal proceedings under which the railway com-

pany asserted it had acquired the rights of the Northern Pacific Railroad Company in the land were ineffective to produce any such result. On this record, however, it is not necessary to pass upon these contentions. As the object of the bill is to seek to charge the defendants as trustees of the land for complainant, plainly, if a valid selection was made, proof that their grantor never acquired title to the land would not establish a right to it in the complainant.

It follows that the decree of the Court of Appeals must be reversed and that of the Circuit Court affirmed.

*And it is so ordered.*

Mr. JUSTICE HARLAN, with whom concurred Mr. JUSTICE DAY, dissenting.

This case is of sufficient importance to justify a full statement of the facts, as well as the grounds upon which we feel constrained to dissent from the opinion and judgment of the court.

By the final decree under review the Circuit Court of Appeals for the Eighth Circuit unanimously reversed the judgment of the Circuit Court with directions to give the plaintiff Hoyt, now appellee, the relief asked in his bill.

The general object of the suit was to have it adjudged that the present defendants, Weyerhaeuser and Humbird, now appellants, should hold the legal title to certain lands in Minnesota in trust for the plaintiff and be enjoined during the pendency of the cause, from selling, disposing of or removing, or from attempting to create any charge upon, the timber standing or lying upon the premises in question.

Many questions have been discussed by counsel. But there is one which seems to require special examination. The facts out of which that question arises may be thus stated:

The land in question is the southwest quarter of the southeast quarter of section seven, township fifty-four, of

range fourteen west, principal meridian. It contains forty acres, and is situated in St. Louis County, Minnesota. It is unfit for cultivation, is valuable chiefly for its timber, has no valuable deposit of gold, silver, cinnabar, copper or coal upon it, was at the time mentioned in the record uninhabited, and contained no mining or other improvements.

For the purpose of availing himself of the act of Congress relating to the sale of timber land in California, Oregon, Nevada, and Washington Territory, approved June 3, 1878, 20 Stat. 89, c. 151,—which act was amended August 4, 1892, and its benefits extended to all the States, 27 Stat. 348, c. 375,—one Richard B. Jones, a citizen of the United States and admittedly, in all respects, qualified under the laws of the United States to enter land, filed, December 17, 1897, with the Register and Receiver in the Land Office at Duluth a verified written duplicate statement, in due form, indicating his desire to purchase the land in dispute under the homestead laws of the United States. One of these statements was promptly transmitted by the Receiver to the General Land Office at Washington.

The Receiver, in conformity with law, at once posted in his office, for the required time, the fact of such application, describing the lands by legal subdivision and furnishing Jones a copy of such notice. That notice was duly published in the newspaper nearest to the land. On the twenty-seventh day of March, 1898, no adverse claim to the land having been filed in the Land Office, the applicant, Jones, after furnishing to the local Register satisfactory proofs of the preliminary facts required by law, *paid to the Receiver the full purchase price of the land,* together with all fees legally due to those officers. Thereupon he was permitted, December 10, 1898, to enter, and *did* enter the land, the Receiver executing and delivering to him at the time an *official receipt and certificate of purchase.* In December, 1898, all the papers and testimony in the matter

of Jones' application, including his certificate of purchase, were transmitted by the Register and Receiver to the General Land Office at Washington, *and by that office was received and filed.* On December 19, 1898, Jones and wife sold and conveyed the land to Minnie Stewart, by deed properly recorded on October 3, 1902. Stewart and wife conveyed to Hoyt, the present plaintiff, now appellee, and that deed was also duly recorded October 3, 1902.

On the second day of December, 1901—nearly *three* years *after Jones got his certificate of purchase and after he had sold the land*—the Commissioner of the General Land Office made a decision, holding for cancellation the entry made by Jones, as above stated, declaring it to be void on the ground that this land (using the words of the Commissioner) "was selected by the Northern Pacific Railroad (now Railway Company) October 17th, 1883 for the second indemnity, per list, rearranged list 15 B, in lieu of land in Section 11, T. 46, R. 16 W., in the primary limits disposed of between date of grant and definite location of the road, which selection has not since been abandoned or the basis otherwise used. The selection was cancelled, however, by letter of March 22, 1897, because the land is east of Duluth, the then [supposed] eastern terminal of the grant under departmental ruling; but said cancellation was rescinded and the selection restored by letter of May 26, 1900, under the decision of the U. S. Supreme Court, *United States* v. *Northern Pacific R. R. Co.*, 177 U. S. 435, that the grant extends to Ashland, Wisconsin. December 17, 1897, Richard B. Jones applied to purchase said tract under the Timber & Stone law, and after due publication and proof, made entry thereof December 10, 1898. Cash certificate No. 14812. Under the decision of the court, the selection of the company is a valid selection, and the claim of Jones not having been perfected prior to January 1, 1898, his claim is not within the act of July 1, 1898 (Departmental decision of May 22, 1900, *Salter* v.

*Company*). Said entry is therefore hereby held for cancellation for conflict with the prior valid selection of the company, subject to appeal. Notify him hereof; the company will be informed by this office."

It does not appear that Jones, or any one claiming under him, had any previous notice of this order, or that there was any trial or regular hearing of the matter in the General Land Office.

Upon appeal to the Secretary of the Interior, the above order of December 2, 1901, was affirmed, and subsequently, but not until October, 1905, a patent was issued to the Northern Pacific Railway Company. 35 L. D. 105.

When Jones entered and purchased the land, paying the Government price for it, and receiving a certificate of his purchase—*which purchase was made and which certificate was given nearly seven years before a patent was issued to the Railroad Company*—there was in the Land Office a *list* of selections alleged to have been filed by the Railroad Company on October 17, 1883. But the list did not assign each selection to specific land in the granted limits, which it was asserted had been lost by the company. That list was received at the local Land Office, and transmitted to the General Land Office. But on the eleventh of April, 1893 the Railroad Company, acting under the direction or suggestion of the Secretary of the Interior, "rearranged" its list so as to specify the particular tract lost in the primary limits. In such list the lands in dispute here were set opposite to particular lands lost in those limits. The lands mentioned in the company's list, whether we take the original or rearranged list, were, it must be remembered, within the *indemnity* limits of the grant made by Congress in 1864 in aid of the construction of the Northern Pacific Railroad. That is not disputed.

The principal assignment of error is that the entry and purchase by Jones—under whom Hoyt claims—of the lands in question were *subordinate* to the rights acquired

by the mere *filing* of the *list* of selections by the Railroad
Company, followed as that was by the approval of the
Secretary of the Interior and by a patent, although *such
approval was not given nor,* as we have seen, *the patent is-
sued to the Railroad Company, until many years after Jones
received his certificate of purchase from the Government.*

Upon final hearing in the Circuit Court, the bill was
dismissed. But upon appeal to the Circuit Court of Ap-
peals, all the judges concurring, that judgment was re-
versed, and the case sent back with directions to enter a
decree for the relief asked in the bill. Rec. 214; *Hoyt* v.
*Weyerhaeuser,* 161 Fed. Rep. 324. The principles in the
latter case were accepted and applied by the Supreme
Court of Minnesota in *Northern Pacific Ry. Co.* v. *Wass,*
104 Minnesota, 411.

Section 3 of the charter of the Northern Pacific Rail-
road Company of July 2, 1864, provided: "And be it fur-
ther enacted, that there be, and hereby is, granted to the
'Northern Pacific Railroad Company,' its successors and
assigns, for the purpose of aiding in the construction of
said railroad and telegraph line to the Pacific coast, and
to secure the safe and speedy transportation of the mails,
troops, munitions of war, and public stores, over the route
of said line of railway, every alternate section of public
land, not mineral, designated by odd numbers, to the
amount of twenty alternate sections per mile, on each side
of said railroad line, as said company may adopt, through
the territories of the United States, and ten alternate sec-
tions of land per mile on each side of said railroad when-
ever it passes through any state, and whenever, on the
line thereof, the United States have full title, not reserved,
sold, granted, or otherwise appropriated, and free from
preëmption, or other claims or rights, at the time the line
of said road is definitely fixed, and a plat thereof filed in
the office of the commissioner of the general land office;
and whenever, prior to said time, any of said sections or

parts of sections shall have been granted, sold, reserved, *occupied by homestead settlers*, or preëmpted, or otherwise disposed of, *other lands* shall be selected by said company *in lieu thereof, under the direction of the Secretary of the Interior*, in alternate sections, and designated by odd numbers, not more than ten miles beyond the limits of said alternate sections. . . ."

But Congress afterwards broadened or extended the limits into which the Railroad Company, under the direction of the Secretary, might go in order to supply deficiencies in the granted limits. By the joint resolution of May 31, 1870, c. 67, 16 Stat. 378, amending the above act of 1864, "Second indemnity limits" were created. The resolution provided: "And in the event of there not being in any state or territory, in which said main line or branch may be located, at the time of the final location thereof, the amount of lands per mile granted by Congress to said company, within the limits prescribed by its charter, then said company shall be entitled, under the directions of the Secretary of the Interior, to receive so many sections of land belonging to the United States, and designated by odd numbers, in such state or territory, within ten miles on each side of said road beyond the limits prescribed in said charter, as will make up such deficiency, on said main line or branch, except mineral and other lands as excepted in the charter of said company of 1864 to the amount of lands that have been granted, sold, reserved, occupied by homestead settlers, preëmpted, or otherwise disposed of subsequent to the passage of the act of July two, eighteen hundred and sixty-four. . . ."

The fundamental inquiry in the case is whether Jones' entry, occupancy and purchase of the lands were subject or subordinate to the *previous filing* of the list of selections by the Railroad Company, the Secretary of the Interior not having approved such list until after such entry, occupancy, and purchase by Jones. The judgment below

proceeded upon two principal grounds: 1. That the Railroad Company did not acquire *any right or interest* in the lands selected within indemnity limits by the *mere filing* of its *list of selections.*   2. That *after* such list was filed, and while it was *unapproved* by the Secretary, the lands remained fully *open to entry and purchase* by homesteaders and preëmptors under the laws of the United States; that in the absence of the approval of the Secretary of the Interior, the *mere filing* of the lists put *no obstacle whatever* in the way of homesteaders or preëmptioners seeking to acquire public lands not already appropriated or sold under the laws of the United States; and that by an entry or purchase in conformity with the homestead or preëmption laws a right *attached* to those lands in favor of the entryman which could not be destroyed or overriden by any *subsequent* approval by the Secretary of the Interior of the original or rearranged list of selections made by the Railroad Company.

These grounds were sustained by a well-reasoned opinion delivered by Judge Sanborn on behalf of the Circuit Court of Appeals.   In view of the elaborate discussion by counsel and by the majority of my brethren, it will be instructive to make a liberal extract from that opinion. After observing that lands within *indemnity* limits did not cease to be public lands open to settlement under the homestead laws, simply because of their having been embraced in a list of selections filed by the Railroad Company to supply losses within place limits, the Circuit Court of Appeals (the italics being ours) said: "The company's unapproved selections did not, therefore, stand in the way of the lands being occupied and entered under the homestead laws.   The mere filing of its lists of selections of indemnity lands *did not have the effect to exclude them from occupancy under the preëmption or homestead laws.  . . . .* The question here is not the jurisdiction but the legality of the decision of the Land Department

and especially of the Secretary, its head, whereby he
awarded this land to the Railway Company. The facts
and the law warranted and required its award and sale
to Jones. When he presented his application to purchase
it under the Timber. and Stone Act the Railway Com-
pany's selection of it was *unapproved* by the Secretary
and that company was without equitable right to it. The
Land Department had jurisdiction to accept the applica-
tion of Jones and to sell the land to him, or to approve
the selection of the company and to award the land to it.
It exercised this jurisdiction, accepted the application of
Jones, permitted him to enter the land, to prove up his
claim to it, sold it to him, took his $100.00 in payment
for it and issued to him his receiver's receipt, *and it did all
this before the selection of the company was approved and
before the company could acquire any right to the land.*
Jones' equitable title to the tract *had then vested,* and
while the jurisdiction of the Land Department continued
until the patent issued, its power was neither arbitrary,
unlimited nor discretionary, and its action was subject to
judicial correction for error of law, fraud or clear mistake.
The jurisdiction and power of disposition which the Land
Department has of the lands of the United States, like
the power of every other department of the government,
is subject to the laws of the land, and the Land Depart-
ment's violation or disregard of them is remediable in
the courts. Its power 'cannot be exercised so as to de-
prive any person of land lawfully entered and paid for.
*By such entry and payment* the purchaser secures a *vested
interest in the property and a right to a patent therefor,* and
can no more be deprived of it by order of the commis-
sioner, than he can be deprived by such order of any other
lawfully acquired property. Any attempted deprivation
in that way will be corrected whenever the matter is pre-
sented so that the judiciary can act upon it.' *Cornelius* v.
*Kessel,* 128 U. S. 456, 461; *Germania Iron Co.* v. *James,* 89

Fed. Rep. 811, 818, 32 C. C. A. 348, 354, 355; *James v. Germania Iron Co.*, 46 C. C. A. 476, 481, 107 Fed. Rep. 597, 602; *Black* v. *Jackson*, 177 U. S. 349, 357; *Orchard* v. *Alexander*, 157 U. S. 372; *Brown* v. *Hitchcock*, 173 U. S. 473, 478. . . . Finally counsel invokes the familiar rule that the decisions of officers of other departments of the government upon questions within their jurisdiction are cogent and persuasive, and should be followed by the courts unless they are clearly erroneous, and he reminds us that the Secretary of the Interior and the Commissioner of the General Land office have carefully considered the questions in this case and have decided that Jones was without legal or equitable claim to this land and that the right of the Railway Company to it was superior. But Jones *was a qualified entryman.* The attempted withdrawals and selections of the land by the Secretary prior to his approval of the company's selection *were unauthorized by law and without legal effect.* The land was open to entry and purchase *until he approved the selection. Jones entered, bought and paid for it before any such approval was made.* And the decisions of the Supreme Court which have been cited leave no doubt that the Secretary and the Commissioner fell into a plain error of law when they took the land which Jones had lawfully purchased from him or from his grantees and gave it to the Railway Company. Erroneous decisions of questions of law by the officers of the Land Department cannot be permitted to deprive the equitable owner of his vested right to lands which he has lawfully purchased from the United States. *Johnson* v. *Towsley*, 13 Wall. 72, 80; *Gibson* v. *Choteau*, 13 Wall. 92, 102; *Shepley* v. *Cowan*, 91 U. S. 330, 340; *Moore* v. *Robbins*, 96 U. S. 530, 526; *St. Paul R. R. Co.* v. *Winona Railroad*, 112 U. S. 720, 733. The conclusion is that by his entry and purchase Jones acquired the entire beneficial ownership and the equitable right to the land in controversy and that the Railway

Company and its successors in interest obtained nothing under the patent but the naked legal title which they held in trust for him and for his successors in interest. This conclusion renders the other questions presented in this case immaterial. The decree must accordingly be reversed and the case must be remanded to the court below with directions to enter a decree for the complainant for the relief prayed in the bill, and it is so ordered."

Many cases, among which was the recent case of *Sjoli* v. *Dreschel*, 199 U. S. 564, were cited by the Circuit Court of Appeals to sustain its conclusion. Attention is specially directed to that case because it was only recently decided after full consideration. The facts in it differ, in some respects, from those in the case now before us, but the principles announced in the *Sjoli case* were clearly the result of previous cases. They directly bear upon the question now under consideration.

It appears from the report of the *Sjoli case* that he *settled* on the land there in dispute in 1884 and his original application was in 1889; whereas, the Railroad Company filed its list of selections of lands within indemnity limits to supply deficiencies in place limits in 1885, Sjoli then being in the actual occupancy of the land, and having the intention, by a formal application, to perfect his claim under the homestead laws. Dreschel claimed under the Railroad Company. Sjoli got a patent in 1901 based primarily on his prior occupancy. That was after the company filed its selections. The essential question in the case was as to the rights of the homestead settler as against the Railroad Company which had filed its list of selections of the lands after the homesteader settled on the lands with the intention to acquire them, but before he made his formal application for them. Summing up the doctrines previously established, this court declared in the *Sjoli case* that from its previous cases the following propositions were to be deduced: "That the Railroad Com-

pany will not acquire a vested interest in particular lands, within or without place limits, merely by filing a map of general route and having the same approved by the Secretary of the Interior, although, upon the *definite location of* its line of road, and the filing and acceptance of a map thereof in the office of the Commissioner of the General Land Office, the lands within *primary* or place limits, not theretofore reserved, sold, granted, or otherwise disposed of, and free from preëmption or other claims or rights, become segregated from the public domain, and no rights in such *place* lands will attach in favor of a settler or occupant who becomes such after definite location; that no rights to lands within *indemnity* limits will attach in favor of the Railroad Company until *after* selections made by it *with the approval of the Secretary of the Interior; that up to the time such approval is given,* lands within. *indemnity* limits, *although embraced by the company's list of selections,* are subject to be disposed of by the United States, *or to be settled upon and occupied under the preëmption and homestead laws of the United States;* and, that the Secretary of the Interior has no authority to withdraw from sale or settlement lands that are within indemnity limits which have not been previously selected *with his approval,* to supply deficiencies within the place limits of the company's road." The words in the *Sjoli case,* "that up to the time such approval [by the Secretary] is given, lands within indemnity limits, *although embraced by the company's list of selections,* are subject to be disposed of by the United States *or to be settled upon and occupied under the homestead laws of the United States*"—were cited with approval in the very recent case of *Osborn* v. *Froyseth,* 216 U. S. 571, 578, and was really *the basis of the decision in that case.*

But the defendants insist that as Jones' occupancy of and application for the land was made while there was pending in the Land Office an unapproved *list* of selections

of lands (including the land in question), which the Railroad Company desired to appropriate in order to supply deficiencies in its primary limits, the subsequent approval by the Secretary of the company's list—although such approval did not in fact occur until 1905—overrode and annulled any right previously acquired by the homesteader Jones, although he applied, paid for and got his certificate of purchase *more than six years* prior to the *actual approval* by the Secretary of the Interior of the original or rearranged selection of these lands. We do not concur in this view. This view cannot be sustained without entirely disregarding the doctrines announced upon full consideration in many other cases, prior to the *Sjoli case.*

As counsel have made an earnest and extended argument in support of the contrary view it may be well to recall a few leading cases on the subject, and see just what has been adjudged.

In *Ryan* v. *Central Pacific R. R. Co.,* 99 U. S. 382, the court construed the second section of the act of July 25, 1866, c. 242 (14 Stat. 239), granting to a company, for the purpose of aiding in the construction of a railroad and telegraph line, alternate odd sections of public land, for ten miles on each side, subject, however, to the condition that the Railroad Company might, *under the direction of the Secretary,* select alternate odd sections, within ten miles on each side, nearest the place limits, to supply deficiencies in lands found to have been granted, sold, reserved, occupied by homestead settlers, preëmpted or otherwise disposed of. As to lands in the *place* limits, the court said that the right of the company to the odd sections became fixed and absolute, when the road was located and the maps of such location were filed. But, said the court, speaking by Mr. Justice Swayne, "with respect to the lieu lands, as they are called, the right was a float, and attached to no specific tracts *until the selection was actually*

*made* in the manner described." In that case the selection made by the company was approved by local land officers and confirmed by the Secretary of the Interior, *when there was no claim upon it.* The court further said, in reference to the land actually selected under the direction of the Secretary, that "the Railroad Company had not and *could not have any claim* to it until *specially selected* as it was for that purpose. It was taken to help satisfy the grant to the extent that the odd sections originally given failed to meet its requirements. When so selected there was no Mexican *or other claim over it.*" In the same case, referring to the deficiency alleged to exist in the place limits, the court said: "It was within the secondary or. indemnity territory where that deficiency was to be supplied. The Railroad Company had not, and could not, have any claim to it until specially selected, as it was for that purpose." This language was quoted with approval in *Osborn* v. *Froyseth,* 216 U. S. 578. So, in the present case when Jones entered and purchased there was no claim upon these lands that gave the Railroad Company any *right* or *interest* whatever in them which could be asserted in opposition to the entryman, whose rights had attached *before any approval* of the selections.

A similar question under another land grant act arose in *Kansas Pacific R. R. Co.* v. *Atchison &c. R. R. Co.,* 112 U. S. 414. The claim in that case was under an act of Congress of July 1, 1862, c. 120 (12 Stat. 489), which made a grant of lands designated by odd numbers on each side of the railroad, "which were not sold, reserved or otherwise disposed of by the United States and to which a preëmption or homestead claim had not attached at the time the land was definitely fixed." This court, speaking by Mr. Justice Field, said: "A right to select them [lands] within certain limits in the case of deficiency within the ten mile limit, was alone conferred, *not a right to any specific land or lands capable of identification by any principles of law or*

*rules of measurement. Neither locality nor quantity is given, from which such lands could be ascertained."*

In *Kansas P. R. R. Co.* v. *Dunmeyer*, 113 U. S. 629, 639, 644, which involved rights under the act of July 2, 1864, (c. 317, 13 Stat. 365), granting lands to a railroad company the court, speaking by Mr. Justice Miller, said: "The reasonable purpose of the Government undoubtedly is that which it expressed, namely, while we are giving liberally to the Railroad Company, we do not give any lands we have already sold, *or to which, according to our laws,* we have permitted *a preëmption or homestead right to attach.* No right to *such* land passes by this grant. No interest in the Railroad Company attaches to *this* land or *is to be founded on this statute."* This case was followed in *Hastings & D. R. Co.* v. *Whitney*, 132 U. S. 357, 366; *Whitney* v. *Taylor*, 158 U. S. 85, 92-3, and *Northern Pacific R. R. Co.* v. *Sanders*, 166 U. S. 620.

In *Wisconsin C. R. Co.* v. *Price County*, 133 U. S. 496, 511, the court, speaking by Mr. Justice Field, in determining the effect of the mere filing of the list of selections, said: "*Until the selections were approved* there were *no selections in fact,* only preliminary proceedings taken for that purpose; and *the indemnity lands remained unaffected in their title. Until then* the lands which might be taken as indemnity were *incapable of identification; the proposed selections remained the property of the United States.* The Government was, indeed, under a promise to give the company indemnity lands in lieu of what might be lost by the causes mentioned. But such promise passed no title, and, *until it was executed, created no legal interest which could be enforced in the courts."* The *mere filing of lists of* selections after the acceptance of the map of definite location of the railroad line between Duluth and Ashland *gave the company no such title as could be enforced by the courts in a suit between private parties.* It is true, the Government was under a promise to give the Railroad Company lands

in the indemnity limits to supply losses in place limits. But, as adjudged in the above cases, that promise *passed no title.* See *Humbird* v. *Avery,* 195 U. S. 480, 507, in which it was said that "no title to indemnity lands is vested until a selection be made by which they are definitely ascertained and the selection made approved by the Secretary of the Interior. This principle is firmly established"— citing *Wisconsin Central R. R.* v. *Price, and other cases.*

In *United States* v. *Missouri &c. Railway,* 141 U. S. 359, 374–5, which case related to a railroad land grant, it was observed that certain *even*-numbered sections within the indemnity limits of the particular railroad concerned could, under the statute there in question, have been legally selected as indemnity lands, if no rights had attached to them before their selection, with the *approval of the Secretary of the Interior.* The court then proceeds: "We say, prior to such selection and approval, because as to lands which may legally be taken for purposes of indemnity the principle is firmly established that title to them does not vest in the railroad company, for the benefit of which they are contingently granted, but, in the fullest legal sense, remains in the United States, *until* they are *actually selected and set apart, under the direction of the Secretary of the Interior, specifically for indemnity purposes*"—citing, among other cases, *Sioux City &c. Railroad* v. *Chicago, Milwaukee &c. Railroad,* 117 U. S. 406, 408, in which the court, speaking by Mr. Justice Miller, said: "No title to indemnity lands was vested until a selection was made by which they were pointed out and ascertained, *and the selection made approved by the Secretary of the Interior.*"

In *New Orleans Pacific Railway Co.* v. *Parker,* 143 U. S. 42, 57, the language of the court was: "As to lands within the indemnity limits, it has always been held that no title is acquired until the specific parcels have been selected *and approved by the Secretary of the Interior*"—citing numerous cases.

A full discussion of the rights of parties in respect of lands in indemnity limits will be found in *Hewitt v. Schultz,* 180 U. S. 139, which was determined after great deliberation in 1901. In that case the question arose whether it was competent for the Secretary of the Interior, after receiving from a railroad company its map of the definite location, could at once withhold or withdraw from sale or entry the odd-numbered sections within the *indemnity* limits to which the company, with the assent of the Secretary, might be permitted to resort in order to supply deficiencies in place limits. Referring to the opinions of Secretaries Lamar, Vilas and Smith, and approving their views, the court held such withdrawal to be unauthorized, indeed, *forbidden,* by the statute in respect to lands, within the *indemnity* limits, *left open by Congress for homesteaders or preëmptioners while the title remained in the United States.* The opinions of those Secretaries proceeded upon the ground taken in previous decisions of this court, that a right to select lands within indemnity limits "was alone conferred, not a right to any specific land or lands capable of identification by any principle of law or rules of measurement;" but that "the right of selection became a barren right, for, *until selection* was made the title remained in the Government, subject to its disposal at pleasure." In the opinion of Secretary Vilas, approved by this court in the *Hewitt case,* it was said: "It [the act of Congress] gave to any person entitled under the preëmption or homestead laws to take any such lands *the absolute right to acquire any proper quantity thereof, in accordance therewith;* and *this right an executive officer could not deprive the settler of.*"

In *Oregon & C. R. Co. v. United States,* 189 U. S. 103, the court said: "Having regard to the adjudged cases, it is to be taken as established that, unless otherwise expressly declared by Congress, *no right* of the Railroad Company *attaches,* or *can* attach to specific lands within indemnity

limits *until there is a selection under the direction, or with the approval, of the Secretary."*

Many other cases to the same effect might be cited.

It is, however, contended that the approval by the Secretary of the Interior of the selection of these lands to supply deficiencies in place limits had relation *back to the date* when the railroad *filed its original list of selections,* and had the effect to override any rights acquired by the homesteader *after* that list was filed, and *before such approval.* This view, if sustained, would practically destroy the rights given to homesteaders and preëmptioners by the acts of Congress as uniformly interpreted by this court. Even after the filing of a list of selection of lands by the beneficiary under the act of Congress, Jones was entitled, of right—prior to the actual approval by the Secretary of the proposed selections—to apply for the lands in dispute, pay for them, get a certificate of his purchase and in that way acquire them. That right *attached* to the lands *when he entered upon and applied for them under the homestead laws,* and he could not be arbitrarily prevented from paying the Government price, and obtaining a certificate of purchase, and perfecting his claim under those laws.

Now, if it be true, and all the cases so hold, that *after* the filing of a list of selections by the Railroad Company of lands within indemnity limits, such lands nevertheless remained fully open to entry, occupancy and purchase by homesteaders; if, as held in *Hewitt* v. *Schultz,* above cited, the Secretary of the Interior himself could not, immediately upon the filing of a list by the Railroad Company of selections of indemnity lands, withdraw such lands from entry or sale, and thus prevent their being entered, occupied and purchased by homesteaders, *prior* to the Secretary's *actual approval* of *such* selections; and if the *mere filing* of the list did not, in itself, in advance of any approval by the Secretary, give the land-grant beneficiary any right or claim whatever, legal or equitable, in or to any

particular lands specified in the list; then there is no basis whatever for the contention that the Secretary's approval of the selection of indemnity lands, *after* the homesteader's claim *attached* to them, can be referred back *to the day* on which the Railroad Company *filed* its list of lands within indemnity limits, sought to be taken by it—an act on his part which, *all the cases agree, did not give it any enforcible interest in particular lands.* That would be using the doctrine of relation, which is a mere fiction of law, to defeat the manifest will of Congress. To state the proposition in another way: If the lands embraced by the company's list of selections were, under the statute, fully open, *after* the filing of that list, to *entry, occupancy and sale, for the benefit of homesteaders*—and that cannot be disputed—how is it possible upon any sound principle, or consistently with the policy adopted by the Government to encourage settlements, that the right thus given to the homesteader could be annulled by any action of the Secretary occurring *after* that right accrued and *became attached* to the lands in behalf of the homesteader? A preference cannot be given in this way to the Railroad Company over the homesteader if regard be had to the purpose of Congress to keep the unappropriated public domain effectively, fully and completely open to settlers so long as the legal title remained in the United States, or until some right of the company *actually attached* to the lands settled upon. A different view cannot be sustained except upon the theory that the mere *application* of a railroad company to take particular lands to supply losses in place limits had the effect to take those lands out of the public domain and prevent their occupancy by homesteaders until it suited the Land Department—which might postpone its ruling for many years—to take up the application and pass upon it; and this, notwithstanding indemnity lands were fully open to be settled upon by homesteaders so long as the title remained in the United States.

At a very early date in the administration of the public lands this court, speaking by Mr. Justice Campbell, in *Clements* v. *Warner*, 24 How. 394, 397, said: "The policy of the Federal Government in favor of settlers upon public lands has been liberal. It recognizes their superior equity, to become the purchasers of a limited extent of land comprehending their improvements, over that of any other person." By the act of Sept. 4, 1841, c. 16 (5 Stat. 453), the preëmption privilege in favor of actual settlers was extended over all the public lands of the United States that were fitted for agricultural purposes and prepared for market. Later statutes enlarged the privilege, so as to embrace lands not subject to sale or entry, and clearly evince that the actual settler is the most favored of the entire class of purchasers." In the recent case of *Ard* v. *Brandon*, 156 U. S. 537, 542, the court, speaking by Mr. Justice Brewer (after referring to *Shepley* v. *Cowan*, 91 U. S. 330, 338), said that "the law deals tenderly with one who, in good faith, goes upon the public lands with a view of making a home thereon. *If he does all that the statute prescribes as a condition of acquiring rights, the law protects him in those rights,* and does not make their continued existence depend alone upon the question whether or no he takes an appeal from an adverse decision of the officers charged with the duty of acting upon his application." The court, in that case, then referred with approval to the observations above cited from *Clements* v. *Warner*, and proceeded: "There can be no question as to the good faith of the defendant. He went upon the land with the view of making it his home. He has occupied it ever since. He did all that was in his power in the first instance to secure the land as his homestead. That he failed was not his fault; it came through the wrongful action of one of the officers of the Government." See also *Northern Pacific R. R.* v. *Amacker*, 175 U. S. 567.

In support of the contrary view much reliance is placed

upon the general rule "that where there are divers acts concurrent to make a conveyance, estate, or other thing, the original act shall be preferred; and to this the other acts shall have relation," Viner's Abridg. tit. Relation, 290; or, as stated by Cruise (5 Real Prop. 510, 511), that "all the several parts and ceremonies necessary to complete a conveyance shall be taken together as one act, and operate from the substantial part by relation." This rule may well apply where the inquiry relates to rights asserted in lands expressly granted in the *place* limits of a road; for, such grants are *in præsenti.* So, perhaps, it might be applied where the contest, under a railroad grant, is between *the Government and its grantee,* who was authorized to make selections of lands within indemnity limits to supply losses in place limits occurring before a specified time. As in *United States* v. *Anderson,* 194 U. S. 394, 399, where the court said: "But even though it be conceded, *arguendo,* that the doctrine in question would allow rights to be acquired by third parties to the injury of the applicant after the making of the selections and pending approval thereof by the Government, it does not follow that it controls the controversy here presented. This results because on this record *the rights of third parties are not involved,* since the controversy concerns only the rights of the United States to *retain as against its grantees* the proceeds recovered by it as the result of a trespass upon land after an application for the selection of such land and pending action thereon by the proper officers of the Government. Under these circumstances the case is one for the application of the fiction of relation, by which, in the interest of justice, a legal title is held to relate back to the initiatory step for the acquisition of the land." But clearly the rule should not be applied in a land-grant case in which the mere filing by the railroad beneficiary at the outset of a *list* of selections of indemnity lands does not affect the title of the United States, and has not, in and of itself, any such efficacy as to

become the basis of a right or interest *in the particular lands* mentioned in such list; especially when, as here, those lands, being within indemnity limits, remain open, according to all the authorities, to entry, occupancy and even purchase by homesteaders to the same extent they would have been had no list of selections ever been filed. In both a practical and legal sense the *filing* of such list was nothing more *than the expression of a desire* or *a request that the Secretary of the Interior permit the company to have certain indemnity lands to supply losses in the place limits.* The Secretary might unduly delay his decision, might never act on such request and thereby, for an unreasonable time, delay settlement on the public lands by those who seek homes on them, and are always dealt tenderly with by the United States. Before such request was acted on in this case rights of the homesteader intervened and became lawfully *attached* to the lands. If the homesteader acquired a *right* in these indemnity lands by entry, occupancy and purchase under the homestead laws, as he undoubtedly did, it is inconceivable that such right could, under any proper application of the doctrine of relation, be affected or overthrown by referring to an antecedent act performed by a different person, but which, *at the time it was performed, did not give any right or interest whatever in the lands,* and interposed no legal obstacle that would prevent homesteaders from entering, occupying or purchasing them. In support of the Railroad Company's position several cases are cited, to some of which we will refer.

The first of these cases, in point of time, is *Campbell* v. *Doe*, 13 How. 244. But that case has no bearing on the precise point under consideration. That was the case of a contest under an act of Congress giving school lands to townships, the selection to be made by the Secretary of the Treasury. One Hamilton made, as he supposed, a selection of certain lands under that act in conformity with regulations prescribed by the Secretary. But his

selection was made while the lands were legally reserved from sale, and he had prior notice of that fact. The land was consequently *not then open to selection*, except pursuant to the act of Congress and the regulations of the Secretary. After alluding to some minor views advanced in the case, this court said: "But in whatever light this may be viewed, we are clear that the Secretary of the Treasury had the power, under the act of Congress, to make the selection; and his decision, declaring the entry of Hamilton invalid, under the circumstances, conclusive." Referring to the argument that what was done by Hamilton was with approval of the Land Office, through whom the Secretary executed the power conferred upon him, the court said: "Yet where the Secretary has interposed and decided the matter, as in the case under consideration, his decision must be considered as the only one under the law."

The opinion in *Campbell* v. *Doe* closes with the suggestion that "under the circumstances no right became vested in him, Hamilton, by reason of his entry of the land, which could be regarded or enforced by *a court of equity*." The court did not refer, although counsel did, to the rule about the relation of time as between two acts, each of which is, in itself, efficacious to give *some substantial right* and was performed by different persons, at different times. It was adjudged in that case—and it was the only point that need have been determined—that the court could not go behind the decision of the Secretary of the Treasury, and that in no view of the case presented could the relief asked be granted by *a court of equity;* whereas, in the case now before us it must be admitted, in view of the act of Congress and the cases determining its scope and effect, that when Jones occupied and entered, as well as when he purchased the land in dispute, it *was part of the public domain*, subject to the control of the United States and *open to homesteaders and preëmptioners*, under the

laws of the United States, although there may have been
at the time, on file, a list of unapproved selections by the
Railroad Company.

Another case much relied on in this connection by the
appellants is *Shepley* v. *Cowan*, 91 U. S. 330, 337. That
case arose under the act of Congress of September 4, 1841,
granting lands to certain States, including Missouri, for
purposes of internal improvement, saving such as were or
might be reserved from sale by any act of Congress or
the proclamation of the President. The plaintiffs claimed
title under a patent issued to one McPherson by the State,
and purporting to be for lands *selected by the State* under the
above act of 1841. The defendants claimed title under a
patent issued by the United States to the heirs of one
Chartrand, based on an alleged preëmption right acquired
by a settlement of their ancestor. McPherson paid for
the lands in dispute and got a certificate showing such
fact. The selections authorized to be made were subject
to the approval of the Secretary of the Treasury. That
officer gave such approval. This court, referring, however,
to the facts and to certain acts of Congress, held that the
State *could not legally select* the lands in dispute as part of
those granted by act of 1841, because they were "*legally
reserved from sale*," consequently nothing could be
claimed under the selection of McPherson. This view was
sufficient to dispose of that case. Nevertheless, the court
proceeds to consider another view which was held to be
fatal to the claim made under the patent issued to Mc-
Pherson. "If," the court said, "the land outside of the
survey as retraced by Brown in 1834 could be deemed
public land, open to selection by the State of Missouri
from the time the survey was returned to the land office
in St. Louis, it was equally open from that date to settle-
ment, and consequent preëmption by settlers. The same
limitation which was imposed by law upon settlement was
imposed by law upon the selection of the State. In either

case the land must have been surveyed, and thus offered
for sale or settlement. The party who takes the initiatory
step in such cases, if followed up to patent, is deemed to
have acquired the better right as against others to the
premises. The patent which is afterwards issued relates
back to the date of the initiatory act, and cuts off all in-
tervening claimants. Thus the patent upon a State se-
lection takes effect as of the time when the selection is
made and reported to the Land Office; and the patent upon
a preëmption settlement takes effect from the time of
the settlement as disclosed in the declaratory statement or
proofs of the settler to the register of the local Land Office.
The action of the State and of the settler must, of course,
in some way be brought officially to the notice of the offi-
cers of the Government having in their custody the rec-
ords and other evidences of title to the property of the
United States before their respective claims to priority of
right can be recognized. But it was not intended by the
8th section of the Act of 1841, in authorizing the State to
make selections of land, to interfere with the operation of
the other provisions of that Act regulating the system of
settlement and preëmption. The two modes of acquiring
title to land from the United States were not in conflict
with each other. *Both were to have full operation*, that one
controlling in a particular case under which the first ini-
tiatory step was had. . . . But whilst according to
these decisions, no vested right as against the United
States is acquired until all the prerequisites for the acqui-
sition of the title have been complied with, parties may, *as
against each other*, acquire a right to be preferred in the pur-
chase or other acquisition of the land, when the United
States have determined to sell or donate the property. In
all *such* cases, the first in time in the commencement of
proceedings for the acquisition of the title, when the same
are regularly followed up, is deemed to be the first in
right. So in this case, Chartrand, the ancestor, by his

previous settlement in 1835 upon the premises in contro-
versy, and residence with his family, and application to
prove his settlement and enter the land, obtained a better
right to the premises, under the law then existing, than
that acquired by McPherson by his subsequent State se-
lection in 1849. His right thus initiated could not be prej-
udiced by the refusal of the local officers to receive his
proofs upon the declaration that the land was then re-
served, if in point of fact the reservation had then ceased."
It thus appears that the general rule determining the
rights of parties under two different acts, performed at
different times, was referred to and applied in a case where
*each* act was of such *a substantial* character as *in itself to
give a right, enforcible by law.* In the case referred to the
selection by the State was wholly void, and could not be
made the basis of *any* right acquired in opposition to the
rights of the settler, although it was prior to the act per-
formed by the settler. The "initiatory step" referred to
in *Shepley* v. *Cowan* was necessarily a step which, *in itself*,
gave *some interest* in the particular land involved. In the
present case, the subsequent act of the homesteader was
confessedly in accordance with law, gave him a substantial
interest in the land, and was not defeated by reason of
the prior act of the Railroad Company in merely filing its
list of selections. We say this for the reason that such fil-
ing, according to the adjudged cases, *could not be made the
basis of any right or interest in these particular lands.*
Within the true meaning of the rule as to the relation of
time between two acts of a substantial character, per-
formed at different times, the initiatory step was that
taken by Jones when he entered and purchased; for there
was no previous step which had in or of itself any efficacy
whatever to confer a right in the lands or prevent him
from acquiring them.

Substantially, the same comments may be made about
the case of *McCreery* v. *Haskell,* 119 U. S. 327, 330, which

is also much relied on by the appellants. The dispute in that case was about certain public lands which, from the date of the grants, were *equally* open to selection by the State and by homesteaders and preëmptioners under an act of Congress relating to land titles in California. By its selection the State could acquire by the act of Congress a right or interest in the lands; by settlement, the preëmptioner could also acquire a right in them. That being the case, this court said: "The land lying outside of this survey thus became, in the language of the act, subject to the general land laws of the United States. It was open to settlement with other public lands, and consequent preëmption by settlers, and to selection by the State on behalf of the school sections within the confirmed Mexican grant. As between the settler and the State, the party which first commenced the proceedings required to obtain the title, if followed up to the final act of the government for its transfer, is considered as being entitled to the property. In such cases, the rule prevails that the first in time is the first in right."

In the present case the Railroad Company, as we have seen, acquired no interest whatever by merely requesting that it have certain indemnity lands to supply losses in place limits; whereas, in the California case, the prior act to which the subsequent act was referred—the selection by the State—would have given to the State a substantial interest in the lands, provided the lands had been open to selection by it at all. Proceeding on the basis that the selection was valid, the state court held that such selection was a prior substantial, effective act to which the subsequent act may be referred under the rule stated in former cases as to relation of time.

Further citation of authorities would seem to be unnecessary. In our opinion the filing by the Railroad Company of a list of lands, within indemnity limits, which it desired to obtain in order to supply deficiencies in place

limits, gave the company no interest in any particular lands, and Jones had the right under the homestead laws of the United States, *after* that list was on file, and before it was *approved by the Secretary,* to enter upon and occupy the indemnity lands so specified, with the intention to acquire them under the laws of the United States, and, by such entry and occupancy, with such intention, acquire a substantial interest or right in them which could not be affected or impaired by the subsequent approval of such list by the Secretary of the Interior; that the mere filing of the list did not and could not, in itself, be made the basis for any claim that would be inconsistent with Jones' legal rights as resulting from his entry and occupancy with the intention stated; consequently, the appellee claiming under Jones had the better right. To make the approval by the Secretary of the Interior relate back to a date when the Railroad Company confessedly did not have, and could not have acquired any, even an inchoate, interest in these lands, and thus cut off and destroy the intervening rights acquired by the homesteader before the Secretary's approval, would be to make a new and dangerous application of the doctrine of relation discussed at the bar. A subsequent act cannot properly be used to give legal effect to a prior act, as of a time when such prior act was performed, if the prior act had no efficacy whatever to confer an interest in the lands to which the two acts related. No adjudged case really holds to the contrary. These views do no injury to the Railroad Company, for if the homesteader is adjudged to have the better right, the company can, under the direction of the Secretary, go into the whole body of indemnity lands and pick out other lands to supply any loss in place limits; whereas, if the homesteader loses the land he has settled upon and occupied he will lose the benefit of his improvements, and must abandon the place he had fixed upon as his home.

One other matter should be referred to. Across the

certificate of purchase issued to Jones these words were written: "This receipt is issued under the order of the Secretary of the Interior, dated February 28th, 1898, subject to any claim the Northern Pacific Railroad Company may have to the lands herein described." Of course, the Secretary had no authority to do this, and his act had no legal efficacy. If the Railroad Company had rights superior to those acquired by Jones those rights could have been protected despite the certificate issued to Jones. If it had none, then the endorsement across the face of the certificate is to be regarded simply as a warning to Jones that he might have in the future a contest with the Railroad Company. The endorsement that Jones' purchase was subject to any claim the company "may have," neither added nor took away rights that belonged at the time to either the company or to Jones.

In our opinion the judgment of the Circuit Court of Appeals should be affirmed.