EMILY M. BAIZ et al.

*v.*

CORO AND LA VELA RAILROAD AND IMPROVEMENT COMPANY.

[Decided May 11th, 1917.]

1. Under the evidence in this case, the claim of the United States of Venezuela is not a preferred claim on the funds in the hands of the receiver. The bonds held by it are not equitable liens on that fund, but only represent a general indebtedness.

2. Venezuela is obliged in equity to put in hotchpot the dividend which she received on her claim through bankruptcy proceedings in her court.

On appeals from the adjudication of the receiver of an insolvent corporation in respect to the allowance of claims, and on application for a counsel fee for services rendered in the recovery of assets by the receiver and for the enforcement of an equitable assignment of or other equitable claim to a share of such assets.

*Mr. Thomas L. Raymond* and *Mr. Francis P. Pace* (of the New York bar), for the Republic of Venezuela.

*Mr. Maximilian T. Rosenberg, Mr. Edgar J. Nathan* and *Mr. Michael H. Cardozo, Jr.* (of the New York bar), for the executors of Baiz.

*Mr. Charles D. Thompson,* for Frank S. Bright.

*Mr. Charles L. Carrick,* receiver *pro se.*

STEVENSON, V. C.

There are in this proceeding three separate matters which have been to a large extent heard together. It will be the function of this memorandum to set forth, as briefly as possible, the conclusions which I have reached and state the principal reasons for such conclusions.

1. The first case to be considered is presented by the appeal of the United States of Venezuela from the action of the receiver, in disallowing its claim to a preferred charge amounting to $114,700, and interest to a large amount thereon, under a mortgage alleged to cover the entire fund in the receiver's lands. I am not certain whether the receiver rejected this claim *in toto,* or allowed it as a general claim, but rejected it as a preferred claim under the mortgage referred to. However that may be, the evidence satisfies my mind that the appellant holds one hundred and thirty-nine mortgage coupon bonds of the Coro and La Vela Railroad and Improvement Company of $1,000 each, and that these bonds constitute valid obligations of this corporation, and that through bankruptcy proceedings in Venezuela $25,300 of this bonded indebtedness was paid, leaving the balance ($114,700) with a large amount of interest due and unpaid and entitled to payment out of the fund in the receiver's hands, either preferentially or concurrently with the general claims which have been proved.

The only question to be considered in relation to this claim of Venezuela is whether it stands as an encumbrance upon the fund in the receiver's hands. My conclusion is that it does not, and the reasons for this conclusion require some statement of the facts.

(1) On December 12th, 1892, the original concession contract for the construction of the Coro and La Vela railroad in Venezuela was granted by the government of Venezuela to "Manases Capriles and to his partners, associates or successors." This concession or contract does not appear to have been approved

as required by law until March 26th, 1895. By assignment dated July 8th, 1895, from the administrator and next of kin of Manases Capriles, who was then deceased, and his original "associates," this concession was transferred to Abram W. Naar. Jacob Baiz, of New York City, appears to have been the promoter or the principal original promoter of this Venezuela railroad enterprise, and for the purpose of its proper exploitation a corporation was created under the laws of New Jersey entitled the Coro and La Vela Railroad and Improvement Company, among the objects of which was the construction and operation of this railroad.

On August 12th, 1895, a month after Naar had acquired the concession from the Capriles syndicate, he assigned it to this New Jersey corporation, the Coro and La Vela Railroad and Improvement Company.

By the tenth article of this original concession it was provided that

"the grantee, his associates or his successors, will have the right to transfer or convey this concession to another party, or to a national or foreign corporation with the same rights, conditions and obligations that are established, complying with the formalities of the law, and giving due notice to the government."

There are grounds for arguing, as will hereinafter appear, that this express provision contemplated the assignment of the concession to a national or foreign corporation or other party capable of carrying out, and intending to carry out, the work of constructing the railroad for the promotion of which the concession was made. The evidence bearing upon this question is in an unsatisfactory condition. I think, however, that we may assume, for present purposes only, that this original concession expressly provided that it might be assigned by way of mortgage to secure money to a foreign corporation not expressly authorized to construct railways in foreign countries, and not intending to engage in such work.

On August 29th, 1895, the Coro and La Vela Railroad and Improvement Company executed in the usual form a mortgage to the Farmers Loan and Trust Company of New York City, as trustee, to secure an issue of one hundred and fifty thousand

bonds of $1,000 each. The one hundred and thirty-nine bonds above mentioned held by the appellant, upon which its claim is based, are a part of this issue. The mortgage covered all the tangible property of the corporation, and also expressly included the concession contract, and used terms which will be mentioned hereafter, to extend its scope as an equitable mortgage to after-acquired property of a certain description.

On May 18th, 1896, while the railroad, as I understand the situation, was in process of construction, there was a law or decree passed by the government of Venezuela permitting the granting of subsidies under certain conditions, to its concessionaires engaged in the construction of railroads at given rates "for every section of ten kilometers finished." This new law, in article 16, provided as follows:

"The concessions cannot be transferred either totally or partly to foreign governments. Transfers between private individuals, syndicates or companies must be previously approved by the national executive in order to be valid."

This new law of Venezuela was approved May 27th, 1896.

On May 18th, 1897, the government of Venezuela, pursuant to the provisions of the last-mentioned statute or decree, entertained the application of an agent of the Coro and La Vela Railroad and Improvement Company for the "addition of an article" to the concession contract of 1892 "for the construction of a railroad between the port of La Vela and the city of Coro, granting a subvention from the national treasury of twenty thousand bolivars for each kilometer of road," and thereupon granted such subvention, payment thereof to be made "at the completion of each ten kilometers." This supplementary concession of 1897 recites that the railroad was then in process of construction. There can be no doubt that this subvention was made to the Coro and La Vela Railroad and Improvement Company which was then engaged in completing the railroad.

On February 18th, 1898, the amount of the subsidy which was due from the government of Venezuela to the Coro and La Vela Railroad and Improvement Company was ascertained, according to law, by the proper officers of the Venezuelan government and "liquidated" at the sum of two hundred and seventy thousand

bolivars. No part of this money was paid except in pursuance of the award hereinafter mentioned.

The history of this railroad enterprise in Venezuela for some years after the liquidation of the subsidy in 1898, is very slightly touched upon in the evidence. It is a matter of history that Venezuela became involved in difficulties with foreign governments, and that her custom houses were seized, and that, largely through the intervention of the United States, an adjustment of the financial claims held by citizens of the United States and other countries against Venezuela was effected through a "mixed commission" created by the United States of America and the Republic of Venezuela. The claim of the Coro and La Vela railroad against Venezuela for the ascertained amount of the subvention had been diligently pressed on behalf of the railroad company by the direction of Mr. Jacob Baiz, who seems to have stood behind the whole enterprise as its chief promoter and chief creditor. Mr. Bright, whose claim to compensation will hereinafter be considered, kept urging this claim through the diplomatic agencies at Washington, under the direction of Mr. Baiz until his death in 1899, and after that under the direction or in the name of his personal representatives or the railroad company itself.

The railroad company at some time before or after the death of Mr. Jacob Baiz—probably some time after—became insolvent, or for some other reason incapable of continuing its business, and the status of its property in Venezuela is only vaguely indicated by the evidence in this case. It is alleged that the government of Venezuela took possession of all the railroad property and proceeded to operate the railroad. It may be surmised that whoever held and operated this railroad made no profit thereby.

On May 2d, 1900, the governor of New Jersey by proclamation declared the charter of the Coro and La Vela Railroad and Improvement Company void on account of the non-payment of taxes due the state for the year 1897. Previous to the making of this proclamation the corporation had been enjoined by the court of chancery of New Jersey from the transaction of any further business on account of the non-payment of said taxes. Whether the directors of the corporation at the time of its dis-

solution by proclamation, made any effort to obtain or administer the assets of the corporation does not appear, but the inference seems to be warranted that these directors took no steps in that direction.

In May, 1903—there being a prospect that the "Mixed Commission" might make an award in favor of the claim which Mr. Bright had been urging—the present suit was brought in this court by Emily M. Baiz and others, executors of Jacob Baiz, deceased, against the Coro and La Vela Railroad and Improvement Company and its directors, praying that a receiver be appointed of all the assets of the corporation, and that the directors be enjoined from transferring or in any way interfering with the same, and thereupon such injunction was granted and Mr. William G. E. See, now deceased, was appointed receiver.

Upon the appointment of Mr. See, as receiver, Mr. Bright, in May, 1903, presented to the proper United States officials, at Washington, a memorial from the receiver setting forth that the Coro and La Vela Railroad and Improvement Company had completed the railroad from La Vela to the city of Coro, in accordance with its contract, and that the amount of the subvention had been liquidated by the Venezuelan officers at two hundred and seventy thousand bolivars, and that no part of this money had been paid. The memorialist prayed that the claim be presented by the agent of the United States to the "Mixed Commission" according to the protocol, &c., and that the agent of the United States be directed to insist upon payment.

In June, 1903, the "Mixed Commission" rendered its judgment awarding the sum of $61,104.70 in United States gold coin "in favor of said claimant," who is referred to as the Coro and La Vela Railroad and Improvement Company, and directed that the said sum should be paid by the government of Venezuela to the government of the United States of America in accordance with the provisions of the convention under which the award was made. No money was received by the United States on this claim for a number of years owing, mainly, I understand, to the preference which was given to the payment of certain other claims of great magnitude. The entire amount has now been collected from the United States government by a

series of receivers, and the present receiver has in hand the sum of $51,000 for distribution *pro rata* among six or eight parties who have presented their claims under oath to one or another of these receivers, or for distribution *pro rata* among the holders of the mortgage bonds. It will be seen that if the mortgage is held to be a valid encumbrance upon this money, the United States of Venezuela will take about fourteen-fifteenths of the fund. If, however, the mortgage is not an encumbrance upon this money, then, as I have found, the bonds to be valid obligations of the insolvent corporation, the United States of Venezuela, will take a smaller but still very large share of the fund, the amount of which will depend upon the aggregate amount of other claims which are allowed. It may be noted in passing that it appears from a statement of the claims presented to the receiver, that if the appeal of Venezuela from the allowance by the receiver of the claim of the estate of Jacob Baiz, amounting to over $75,000, should be finally sustained, the result would be that Venezuela would not be greatly interested in securing the establishment of the mortgage as a lien on the fund. If, however, the Baiz claim is finally allowed, the dividend of Venezuela will be reduced from about fourteen-fifteenths to about two-thirds—the other claims allowed besides these two large ones being for comparatively small sums.

I have referred to the obscurity in which the evidence leaves the status of the railroad, which seems to have been to a large extent completed by 1898, during the eight or ten years which followed. The sole purpose of the present suit in this court seems to have been to procure the appointment of a receiver through whom the claim for the two hundred and seventy thousand bolivars could be presented to the "Mixed Commission," and by whom any money awarded on account of that claim could be received. The first receiver, Mr. See, appears to have made no effort to discover any assets in Venezuela. In whose possession these assets were in 1903, and thereafter until 1908 we are not definitely informed, although, as I have said, it is alleged that the railroad property in Venezuela had been seized by the government of Venezuela.

Continuing the history of this South American railroad enter-

prise, it appears that however the railroad may have been then held or operated, in December, 1907, the Republic of Venezuela filed a petition in bankruptcy in one of her courts against the Coro and La Vela Railroad and Improvement Company, and thereupon promptly the court made an adjudication of bankruptcy against the company. The judgment of the court found, in accordance with the allegations of the petition filed on behalf of the Republic of Venezuela, that Venezuela was a creditor of the bankrupt as the holder of one hundred and forty of the said issue of mortgage bonds. And further found, in accordance with the allegations and prayer of the petition, that the mortgage was invalid under the laws of Venezuela as to all property situate in that country. The bankruptcy proceedings seem to have corresponded with similar proceedings *in rem* under bankrupt laws of other nations, but include a judgment invalidating the mortgage, although the inference is that the mortgagee, the Farmers Loan and Trust Company of New York, was not notified of the destructive claim which was made against its mortgage, and in no way appeared or was represented in the proceeding. The important fact, however, to be noted is that Venezuela procured this decree adjudicating in her court that she was a creditor as the holder of these mortgage bonds, that the mortgage which secured these bonds, and which covered practically all the property of the mortgagor, and all of which was situated in Venezuela, was, under the laws of Venezuela, invalid as to such property. The administration of the assets of the bankrupt then proceeded in a manner corresponding with such proceedings in our own courts. The decree of bankruptcy directed that creditors residing in Venezuela should present their claims within fifteen days, "plus the traveling time," and that creditors residing out of Venezuela be notified of the adjudication of bankruptcy, and that such creditors should prove their claims within certain periods prescribed according to the location of the creditors. Whether the estate of Jacob Baiz was treated as resident in Venezuela, or whether it was treated as resident in New York, and therefore entitled to five months' notice, does not appear. It does appear that the claim of the Baiz estate was not proved in this bankruptcy proceeding.

On October 26th, 1908, the Venezuelan bankrupt court made an order for the sale of the railway, telephone line, real estate, buildings, machinery, rolling stock, &c., of the bankrupt, and in describing the property sold expressly enumerated the "stock of tools, implements and other personal property for the use and service of the railroad enterprise situate at its stations at Coro and La Vela and in the workshop." It is plain that the liability of Venezuela under the award of the "Mixed Commission" made five years before this bankrupt sale, was not included in the assets of the bankrupt which were inventoried and sold. This liability had been merged in an award in the nature of a judgment requiring Venezuela to pay an amount of money to the United States of America on account of the claim of the Coro and La Vela Railroad and Improvement Company, and the bankrupt court of Venezuela made no attempt to collect or sell the award. The decree for the sale of the assets of the company recognized the claim of Venezuela, as the holder of one hundred and forty of the mortgage bonds, to an amount with interest then ascertained to be over a million bolivars. The aggregate amount of the claims of thirteen other creditors was found by the decree to be nearly seventy thousand bolivars. Venezuela, therefore, was found entitled to about fourteen-fifteenths of the entire proceeds of the bankrupt estate. The decree further adjudicates, a sale having been held and the assets apparently having been bought in on behalf of Venezuela, that the United States of Venezuela was the owner of the assets "for the price of one hundred and thirty-nine thousand ninety four bolivars, the said property to form part of the private dominion of the United States of Venezuela." It may be noted that this final decree of October 26th, 1908, adjudicates again that the mortgage of the Farmers Loan and Trust Company

"was not known to the Venezuelan law, could not produce the consequence of creating in favor of the holders of said bonds any liens or special rights over the properties situated in Venezuela as are those that are being sold in this proceeding,"

and that the purchaser would take free from all encumbrances.

It may be also noted in passing as one of the curious and interesting features of these Venezuela bankrupt proceedings, in 1907, that it does not appear that the Coro and La Vela Railroad and Improvement Company had been doing any business in Venezuela or elsewhere for at least four years. In 1900, this New Jersey corporation was enjoined by the court of chancery of New Jersey from prosecuting any business on account of the non-payment of taxes and was dissolved by proclamation according to law, and, subsequently, in 1903, its entire property, so far as the State of New Jersey could control the same, was placed in the hands of a receiver subject, of course, to valid liens.

(2) Proceeding now to the examination of the question whether the mortgage of the Farmers Loan and Trust Company ever was a valid encumbrance upon the original concession contract, there seem to be strong grounds for answering this question adversely to Venezuela. The mortgagor was located in Venezuela. Apart from raising money and purchasing material, there is no evidence that it ever transacted the business of constructing or operating a railroad anywhere else. It was created for the purpose of constructing and operating for forty years this railroad in Venezuela. This New Jersey company not only established itself in business in Venezuela, but accepted a concession contract under Venezuelan law, and that contract expressly permitted its transfer to another party "with the same rights, conditions and obligations that are established, complying with the formalities of the law and giving due notice to the government." Whether the "formalities of the law" were complied with and notice was given to the government when this assignment by way of mortgage was made to the Farmers Loan and Trust Company, are matters upon which the evidence gives little, if any, information. The express provision for an assignment of the concession under conditions seems to imply the exclusion of assignments without those conditions. Moreover, the purpose of the article permitting an assignment seems to have been to permit an assignee to come in and construct and operate the railroad under the terms of the concession. We are certainly far away from such an assignment when we are presented

with this mortgage made to secure money and given to a trust company located in the city of New York, which could hardly be expected to stand ready to go down to Venezuela, construct this railroad and then operate it for forty years.

In view, however, of the unsettled questions of fact relating to this branch of our inquiry, and the unsettled questions of Venezuela law pertaining to it, I have concluded to pass this fundamental and possibly fatal objection to the establishment of this mortgage as an encumbrance upon the *right* of the Coro and La Vela Railroad and Improvement Company to receive this award of money now in the hands of the receiver, which award was based upon a recognition and enforcement of this right.

(3) But we are not dealing with the original concession of May 12th, 1892. For present purposes, we may assume the mortgage to have been a valid encumbrance upon all the rights of the Coro and La Vela Railroad and Improvement Company under that concession. We are dealing with the subsidy granted by what is in effect a supplemental concession in 1897, nearly two years after the mortgage was made to the Farmers Loan and Trust Company to secure this issue of $150,000 of bonds, and one year after a new law had been passed by the government of Venezuela permitting such subsidies to be granted. When the mortgage was made, not only was there no subsidy provided for, but there was no law under which any such subsidy could be granted. It might be argued that the mortgage of the original concession of 1892, especially in view of the words contained in the mortgage with respect to after-acquired property, would operate as an equitable mortgage upon supplementary articles which might be added from time to time by agreement between the contracting parties, Venezuela and the mortgagor. Unfortunately for this argument, when we examine the law of Venezuela passed in 1896, permitting subsidies to be provided for in concession contracts like this, we find the above-quoted express provision constituting article 16 of the statute:

"The concessions cannot be transferred either totally or partly to foreign governments. Transfers between private individuals, syndicates or companies must be previously approved by the National Executive in order to be valid."

There is no pretence that the alleged equitable or anticipatory transfer made in 1895 to the Farmers Loan and Trust Company of New York was ever "previously approved" or at any time approved by the national executive of Venezuela as is expressly required by the law of 1896 under which the subsidy was granted to the Coro and La Vela Railroad and Improvement Company. If it is worth while to infer or surmise as to the reasons of this limitation upon transfers, in view of the plain language of the law, it may be noted that the manifest object of Venezuela in providing by law for these subsidies to railroad companies was to secure the construction of railroads. Great evils can, I think, be pointed out resulting in the prevention of the construction of a subsidized railroad if the concession and the right to receive a subsidy under it could be mortgaged to a foreign trust company. In view, however, of what seems to be the plain prohibition of the law above set forth, any further discussion of the purpose and object of the law in order to aid in its interpretation seems to be unnecessary.

In considering the question of the assignability of the original concession of 1892, and the supplementary concession of 1897, it must be borne in mind that while the original concession was assigned to Abram W. Naar, and it does not appear that such assignment was permissible, or in fact was valid under the laws of Venezuela, or, if valid, was made in accordance with the express terms of the concession itself, the subsequent assignment by Naar to the Coro and La Vela Railroad and Improvement Company was recognized in the most solemn manner by Venezuela, and the subsidy was made directly to that company. It is the transfer of rights under the concession to a trust company in a foreign state by means of an instrument operating as an equitable mortgage to secure loans of money with which we must deal and to which we must apply these provisions of the Venezuelan contracts and Venezuelan laws.

In my judgment this mortgage of 1895 purporting to cover the concession of 1892, if valid as to that original concession, could not possibly operate as an equitable mortgage upon the after-acquired subsidy under the law of 1896, when that law expressly prohibits such a mortgage.

29

(4) If we assume that the Coro and La Vela Railroad and Improvement Company in 1895 could make a valid mortgage of this possible right to a subsidy, which possibly might arise in the future under a new law which Venezuela might possibly enact, and a supplementary concession which Venezuela might grant, my examination of the terms of the mortgage itself leads me to the conclusion that it could not and did not at any time operate as an equitable assignment or mortgage of the right of the mortgagor to receive this subsidy, which right could not have been lawfully created when the mortgage was made, and in fact did not come into existence until two years afterwards. The rule is well settled which compels a somewhat strict construction of these railroad mortgages when ascertaining their effect as equitable mortgages upon after-acquired property. The limits of this memorandum, if it is to have any, will not permit a discussion of the phraseology of this mortgage which must be reviewed for a minute investigation of its interpretation and application to the subvention. The mortgage undertakes expressly to convey the grant and concession of 1892 and all property that might thereafter be acquired by the mortgagor "for use in connection with its business as a railroad corporation." The authorities, I think, lead to the limitation of this description of after-acquired property to what may be so acquired in connection with the operation, not the construction, of the railroad. The *habendum* which counsel for Venezuela thinks favors his view of the case, defines the tenure of the mortgagee as including the said property and the premises, real and personal, rights, &c.,

"hereby granted, assigned and conveyed, or intended so to be, with all and singular the reversion, remainders, income, tolls, revenues, rents, issues and profits arising out of or from the operation of said railroad, or any part thereof, and privileges, benefits and appurtenances now or hereafter belonging or in anywise appertaining thereto."

In my opinion the *habendum* clause, the function of which it is to define the tenure of the grantee, indicates that the mortgage did not contemplate the acquisition of a subsidy or subvention under a law which might thereafter be enacted, but only moneys which might be acquired from the construction of the railroad.

*3 Cook Corp. (4th ed.)* §§ *856, 857; Humphreys* v. *McKis-sock, 140 U. S. 304; 35 L. Ed. 373; New Orleans Pacific Rail-road Co.* v. *Parker, 143 U. S. 42; 36 L. Ed. 66; Smith* v. *Mc-Cullough, 104 U. S. 25; 26 L. Ed. 637; Emerson* v. *European and North American Ry. Co., 67 Me. 387.*

(5) ·If we assume that the mortgage contains language which should be construed as creating under certain conditions an equitable encumbrance upon this after-acquired right to the sub-vention, I think that the authorities will not permit the establish-ment of such an equity in favor of the mortgage under the cir-cumstances proved in this case.  In the first place, it should be noted that no attempt has been made to argue that the mort-gagee could have taken possession of this sum of two hundred and seventy thousand bolivars if upon the liquidation of the subven-tion at that sum the money had been paid by ·Venezuela.  The most that has been argued, and as I think can possibly with any show of reason be argued, is that upon the mortgage coming due or default in its covenants being made, the equity of the mort-gagee in respect of this money would arise.  That the mortgagor before the mortgage fell due could collect the two hundred and seventy thousand bolivars and expend them in any legitimate way cannot be doubted.

The mortgage following the usual form provides that until default, &c., the mortgagor should be entitled "to remain in the full possession, use and enjoyment and control" of all the prop-erty mortgaged or intended to be mortgaged, and also should be entitled to manage the same and to receive and use the income," &c., and "all moneys payable and receivable or derivable there-from."

The mortgage further provides that in case of default for six months to pay, &c., the mortgagee might take possession of the mortgaged property and conduct "the business operations" of the mortgagor and exercise its franchises and collect the revenues, &c., and after deducting the expenses apply the residue of the money to the payment of the amount due on the bonds.

The mortgage also provided that in case of default, &c., the entire mortgage debt might be declared to be due and thereupon the mortgagee might sell the mortgaged property at public auc-

tion in the manner prescribed.  Provision was also made in the mortgage for the appointment of a receiver upon the commencement of any judicial proceedings to enforce the rights of the mortgagee and the bondholders.

I think under the provisions of this mortgage the most important of which are above set forth, the right of the mortgagee and the bondholders to have this instrument of mortgage enforced as an equitable mortgage upon this subsidy, the right to which did not exist when the mortgage was made, does not appear to have been contemplated as liable to come into existence by the parties to the mortgage, and in fact came into existence two years afterwards—a right pertaining to the construction of the railroad and not to its future operation—can only be asserted after some form of seizure of the subsidy or the property with which it was connected, or the institution of some proceeding to enforce the mortgage.  While the mortgagee was standing aside and making no effort in any way whatever to enforce its mortgage even upon the tangible property of the mortgagor, and was leaving the mortgagor, so far as it (the mortgagee) was concerned, in full possession and control of all its property, including this subvention, the mortgagor had full power as against it (the mortgagee) to make or suffer any lawful transfer of this subvention, this right to receive the subsidy. *Gilman* v. *Ill. and Miss. Telegraph Co.*, *91 U. S. 603; 23 L. Ed. 405; American Bridge Co.* v. *Heidelbach, 94 U. S. 798; 24 L. Ed. 144; Freedmen's Savings and Trust Co.* v. *Shepherd, 127 U. S. 494; 32 L. Ed. 163; Zarlman* v. *First National Bank, 189 N. Y. 267; Smith* v. *Eastern Railway Co., 124 Mass. 154.*

In this situation of affairs in 1900 the corporation was enjoined from prosecuting any business, and in 1903 all its assets, so far as the State of New Jersey controlled such assets, were vested in a receiver appointed by a New Jersey court.  Moreover, this receiver forthwith proceeded to assert his right as the successor of the Coro and La Vela Railroad and Improvement Company to the only assets which he seems to have noticed, viz., the right, under the subvention from Venezuela and the ascertainment of the amount thereof by the proper Vene-

zuelan officers, to recover through the "Mixed Commission" the amount of the subvention, viz., two hundred and seventy thousand bolivars. The receiver asserted his own right, not the right of the mortgagee whom he disregarded, and the mortgagee and the bondholders stood by and allowed him to recover and receive the moneys.

Who in 1903 were the holders of this issue of bonds we are not informed. Venezuela appeared in 1907 as the owner of fourteen-fifteenths of them. Whether or not some time during a period of eight or ten years which preceded the bankruptcy proceedings in Venezuela in 1907 the valuable assets of the railroad were seized by Venezuela or some other party, we are obliged to infer that the mortgagee and the bondholders did not make the slightest effort to assert any rights under the mortgage in any way whatever. The entire effort to enforce the subvention and collect the amount thereof through the "Mixed Commission" was made by the New Jersey receiver without the slightest aid from the mortgagee or the bondholders. This successful operation of the receiver to recover money alleged to have been mortgaged for more than the amount thereof, seems to have been the plainest possible assertion of a right in the receiver in derogation of any alleged right or claim of the mortgagee. Except in certain cases a receiver of a dissolved or insolvent corporation administers only the equity of mortgaged properties. It would be a strange result, it seems to me, if this so-called equitable mortgagee could be allowed to stand by, assert no right in any way to this subvention, and then when the receiver primarily representing the general creditors had effected a recovery of the amount of the subvention, a sum amounting to over $60,000, come into a court of equity and have its mortgage established as an equitable mortgage upon the $60,000 under the terms of the mortgage relating to after-acquired property.

(6) The Republic of Venezuela, through its representative and attorney, as we have seen, instituted the proceedings in bankruptcy against the Coro and La Vela Railroad and Improvement Company in 1907, ignoring the fact, that long before the corporate existence of the alleged bankrupt had been terminated

under the laws of New Jersey, under which the bankrupt corporation was created, and also ignoring the fact that the New Jersey court of chancery had placed this New Jersey corporation under an injunction restraining it from doing any business, and undertaking under the statute of New Jersey to place all the assets of said corporation, wherever situate, in the possession of a receiver then appointed. In the petition which the Republic of Venezuela filed in these bankrupt proceedings, she asserted that the mortgage to the Farmers Loan and Trust Company was invalid as to property situate in Venezuela, and procured an adjudication to that effect. Reasons may be surmised why Venezuela in 1907 and 1908, being the holder of one hundred and thirty-nine or one hundred and forty of these bonds, preferred to have the mortgage declared void, and the Farmers Loan and Trust Company excluded from consideration, provided the bonds themselves were adjudged valid obligations representing a valid debt, but in regard to this matter the evidence is unsatisfactory.

The point to be brought out is that Venezuela in 1897 and 1898, in the most solemn manner in her own court, asserted the invalidity of this mortgage as a mortgage of property situate in Venezuela, and procured in that court an adjudication to that effect, and subsequently received as a general creditor holding one hundred and forty of the mortgage bonds, the great bulk of the proceeds of the assets of the bankrupt administered in the Venezuela court, which assets were described in and were attempted to be covered by the mortgage; and now having secured this result, Venezuela comes forward in the court of chancery of New Jersey and seeks to establish the validity in New Jersey of this same mortgage, and have this court enforce the mortgage as an equitable mortgage covering the proceeds of this subvention as after-acquired property. Of course there is no inconsistency in the claim of Venezuela that this mortgage was inoperative upon property in Venezuela under Venezuelan law, but was valid and operative in respect of property situate in New Jersey under New Jersey law. The inconsistency, however, is made manifest when we consider the legal *situs* of the right of the Coro and La Vela Railroad and Improvement Company to

receive this subvention of two hundred and seventy thousand bolivars under the supplemental concession made by Venezuela, in pursuance of its law enacted in 1896, a year after the mortgage was made. The Coro and La Vela Railroad and Improvement Company was transacting its business as a railroad corporation wholly in the State of Venezuela. The Venezuelan decree of bankruptcy declared that the corporation had its *de facto* domicile in that country, and as such was amenable to legal proceedings including bankrupt proceedings in the Venezuelan courts. Is it not plain that this right under the supplemental concession of 1897 to a subsidy from the State of Venezuela had its *situs* as property in that state where all money due under its terms was payable? The right to receive this money arose under a contract which was made between parties domiciled in Venezuela and which was to be wholly performed in Venezuela.

It seems to me that it only makes confusion of thought to consider the *situs* of this money in the hands of the New Jersey receiver. This money was never mortgaged. This money represents an asset of the insolvent corporation which at all times had its *situs* in Venezuela. The government of the United States through a treaty with Venezuela procured an award from arbitrators sitting in Europe for the payment of a sum of money to the United States in satisfaction of the original claim of the Coro and La Vela Railroad and Improvement Company, which was established and "liquidated" at two hundred and seventy thousand bolivars in 1898 by the officials of Venezuela acting in that state. The mortgage either covered the after-acquired right to a subsidy or it did not. If the mortgage became equitably extended so as to cover this right to a subsidy, it must have covered that right when such right had its *situs* as property exclusively in Venezuela. If when the amount due under the subvention was liquidated the obligation of Venezuela to pay that amount created an indebtedness, it still remains that the mortgagor "acquired" this indebtedness as property while domiciled in Venezuela, such indebtedness being payable in Venezuelan money in the State of Venezuela and by the sovereign state itself, which was and is located permanently within its territory. Notwithstanding the rules

which in some respects are conflicting in regard to the legal *situs* of debts for various purposes, in my judgment this indebtedness of Venezuela to the Coro and La Vela Railroad and Improvement Company should be considered for the purposes of this mortgage, as having its *situs* in Venezuela. Venezuela, however, procured an adjudication in her court that the mortgage was void in Venezuela as to all property situate in that state. Such adjudication necessarily includes the proposition that the mortgage was void as to this indebtedness under the subvention, or, to state the matter otherwise, that under the laws of Venezuela this mortgage could not be allowed any force or effect whatever in its relation either to the subvention or the liquidated indebtedness under the subvention, both of which the Coro and La Vela Railroad and Improvement Company "acquired" long after the mortgage was made.

The fact that this money has come into the possession of the New Jersey receiver while giving the New Jersey court full jurisdiction over it, does not affect its relation to the mortgage as an equitable mortgage of after-acquired property. The receiver might be a resident of another state or even of Venezuela. Such a thing is legally possible.

The inconsistency of the claim of Venezuela in this court consists, I think, in the fact that having procured in her own court a decree that this mortgage was absolutely void as to all property covered by it which was situate in Venezuela, she now endeavors to get a decree from this court precisely to the contrary. It is true counsel for Venezuela has made no argument and presented no theory in regard to the *situs* of the asset of this insolvent corporation represented by the fund in the receiver's hands. His argument seems, however, to assume that this fund represents property acquired by the mortgagor after the mortgage was given, situate in the State of New Jersey, or, at any rate, not situate in Venezuela.

It has not been argued that there has been any change of the *situs* of the original after-acquired subvention. Until this New Jersey corporation was dissolved by proclamation and its assets were vested in a receiver, and it was enjoined from acquiring property by the decree of this court, there certainly was no

transfer from Venezuela to New Jersey or any other state of the *situs* of the subvention under the supplemental concession of 1897, or of the indebtedness of two hundred and seventy thousand bolivars which was ascertained to be due under the subvention in 1898. When under a treaty between the United States and Venezuela the "Mixed Commission" awarded the payment of the two hundred and seventy thousand bolivars with interest thereon in satisfaction of all claims under the subvention, such payment was directed to be made to the United States government and the United States government then turned over the money to the New Jersey receiver. The Coro and La Vela Railroad and Improvement Company never "acquired" this money when it was paid to the United States government or when it was transferred to the New Jersey receiver. Years before the first payment by Venezuela on account of the award was made to the United States government, the Coro and La Vela Railroad and Improvement Company had been dissolved by proclamation and had been rendered incapable of acquiring any property and a receiver in New Jersey of all its assets had been appointed. The fact that in the award the Coro and La Vela Railroad and Improvement Company is mentioned as the claimant, is a matter of no consequence; if at that time the right to this money was an asset within the jurisdiction of New Jersey, such asset was vested in the receiver and it was the receiver that appeared as the actor in the memorial addressed to the "Mixed Commission" presenting the claim held originally by the Coro and La Vela Railroad and Improvement Company.

It is evident, I think, that Venezuela in order to sustain her claim to a preferential payment on account of this mortgage, must necessarily take the position that the mortgage equitably covered this indebtedness of two hundred and seventy thousand bolivars, the *situs* of which was in Venezuela when the right to receive it was "acquired" by the Coro and La Vela Railroad and Improvement Company, notwithstanding that Venezuela succeeded in procuring a decree in her own court that the mortgage as to all property situate in Venezuela was invalid.

(7) I state the conclusion without argument and with a mere citation of a few authorities to sustain it, that in this case the claimant (Venezuela) is obliged in equity to put in hotchpot the dividend which she received on her claim through the bankruptcy proceedings in Venezuela. The other creditors whose claims have been presented to the receivers in this case, and have been sustained, are entitled to stand on a level with the Republic of Venezuela. *Wharton Conf. of L.* § *798; Phillips* v. *Hunter, 2 H. Black 402; Banco de Portugal* v. *Waddell, L. R. 5 App. Cas. 161; In re Bonnaffe, 23 N. Y. 169.*

This rule of equity and equality, which applies to the case of a creditor who has already received a dividend in foreign bankruptcy proceedings, is in somewhat clumsy language declared and enacted in the present United States Bankrupt act, section 65d.

2 The appeal of the Republic of Venezuela from the adjudication of the receiver allowing the claim of the Baiz estate, is not sustained. I do not recall that there is any question as to the amount of that claim. If there is such question the matter can be determined upon settlement of the decree. The proof establishes the claim as something over $70,000.

It is unnecessary to consider the status of the five bonds alleged to be held by the Baiz estate as collateral to its claim, because of the conclusion which I have reached that the bonds are not equitable liens on the fund but only represent a general indebtedness. These five bonds, therefore, do not increase the claim of the Baiz estate amounting to over $70,000, nor do they give to the Baiz estate any greater right or equity than that which the estate holds as an established general creditor.

3. The claim of Mr. Bright has received so much attention from court and counsel that an extensive discussion of it seems quite unnecessary. This claim was the subject of an oral opinion rendered upon its first presentation some time ago. My conclusion in regard to this claim has virtually been announced and the grounds therefor have been indicated.

I may say briefly that this whole recovery from the Venezuelan government through the "Mixed Commission" is the product of the industry, skill and zeal of this Washington lawyer, Mr.

Bright, who originally took hold of the matter upon a somewhat indefinite but contingent retainer under an arrangement with Mr. Baiz in his lifetime acting for the Coro and La Vela Railroad and Improvement Company. To ignore Mr. Bright's substantial claim and to turn over to these creditors the asset which he recovered under the circumstances proved, would in my judgment, be a flagrant violation of the plainest principles of equity and justice. If Mr. Bright had not succeeded he would have lost the fruits of all his protracted labors. My conclusion is that in addition to the sum of $6,000 which heretofore was allowed to him, he is justly entitled to the reduced sum which his counsel asked for on his behalf, viz.,' $9,000.

If there are any matters overlooked in this somewhat complex mass of litigations disposed of by this memorandum, they may be brought to my attention upon settlement of the decree which will be upon notice.